Opinion
KAUS, J.
In this proceeding, prosecuted under the 1977 death penalty legislation (Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262, former Pen. Code, §§ 190-190.6),[1] defendant Andrew Edward Robertson was convicted of two counts of first degree murder and nine special circumstances. At the penalty *31 phase, the jury fixed the punishment at death. His appeal to this court is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)
I
This case arises out of the deaths of two women, Karen Ann Litzau and Kimberly Gloe, in October 1977. Shortly after his arrest, defendant gave a detailed, tape-recorded confession to both homicides, and then reenacted the killings on film at the scenes of the crimes. The tape-recorded and filmed confessions were admitted at trial. Complemented by additional evidence presented by the prosecution, the record discloses the following facts.
In the early morning hours—2 or 3 a.m.—of October 20, 1977, defendant stopped and picked up Karen Litzau as she was hitchhiking on a freeway on-ramp in San Bernardino. At first defendant only intended to give Litzau a ride but then, as the two were driving, decided to have sexual relations with her. When she refused, he put his right arm around her neck, pressed a knife to her throat and told her they were going to have intercourse.
After leaving the freeway and driving to a secluded area on a dirt road, defendant stopped the car. When Litzau began to call him names—“crazy, a son of a bitch, an asshole, everything in the book”—defendant began ripping off her clothes. Litzau asked defendant if he was going to kill her and he said “no.”
Defendant then placed Litzau on the hood of his car, intending to have intercourse. When she started calling him names again, however, he “yanked her off the car and started stabbing her.”
At one point in his confessions, defendant stated that he only remembered stabbing Litzau twice and that “[m]y mind went blank. The next thing I knew I was on the freeway and I had blood on my hands.” Immediately thereafter, however, defendant described the incident in considerable detail, recalling that he had cut Litzau’s throat and stomach and had stabbed her repeatedly in the heart, back and vagina. In the course of his confession, defendant also admitted that at one point during the stabbing he stopped momentarily, thinking Litzau was dead, but when he discovered that she was still alive, he cut her throat.
Before leaving the scene, defendant tried to cut off a breast of Litzau’s lifeless body but failed because his knife was too dull. He took several pairs of panties, a cosmetic case and an engraved cigarette lighter from her suitcase, urinated on the body and drove away. At different points in his confession defendant stated alternatively that he decided to kill Litzau when she “call[ed] [me] names” and “when she started saying that she was going to tell on me.”
*32 Litzau’s body was found the next morning. An autopsy revealed more than 170 knife wounds over her entire body.
One night about a week and a half later, defendant picked up Kimberly Gloe as she was offering her services as a prostitute on a street in San Bernardino. After she entered the car, defendant pulled a knife and drove to a secluded area. He had brought his knife because he wanted sex. When Gloe told him that force was not necessary, he put the knife away. He stopped the car and they engaged in various sex acts.
Thereafter, Gloe told defendant that she “had a guy rape me before and I squealed on him, but they couldn’t find him, and I might squeal on you, too.” When defendant said “You wouldn’t do that, would you?” she responded, “Yeah, I would.” Gloe then got out of the car to get her clothes and clean herself off.
Defendant grabbed his knife, followed her out of the car and started stabbing her in the stomach. He remembered stabbing all over her body, cutting her throat and stomach, removing her intestines, cutting off her breasts,[2] and stabbing her in the vagina, leaving his knife embedded there. He stated that he stabbed her in the vagina because “I wanted to do it the same way I did Karen. ” A subsequent autopsy revealed 120 separate stab and incisional wounds.
After Gloe was dead, defendant attempted to break her legs “[b]y standing and pulling on them” and then again urinated on the body. He left with her address book and her bra and panties. Asked if he had intended to kill Gloe when he first picked her up, defendant stated that “I didn’t have any intention of killing her until she started saying she was going to snitch on me. ...”
A few days after Gloe’s death, a woman who had seen Gloe get into defendant’s car spotted the car parked in a gas station and notified the police, who traced the car to defendant and arrested him. At the time of his arrest, Litzau’s cigarette lighter was found in his pocket. With defendant’s consent, the officers searched his apartment and found Gloe’s address book, Litzau’s cosmetic case and—under his bed—numerous items of women’s underwear, including several belonging to each of the victims.
In addition to presenting this extensive evidence linking defendant to the two deaths, the prosecution—as part of its case-in-chief—called Kim P. who testified about an incident in May 1976, more than a year before the Litzau and *33 Gloe killings. Kim P. testified that late one night defendant abducted her from a truckstop, put a knife to her throat and threatened to kill her if she did anything “funny.” She also said that he told her that he “had killed two others and that they hadn’t found them yet . . . hadn’t found him yet.”
After driving to an isolated area, defendant ordered her to disrobe; as she complied, defendant cut away her shirt and underclothes with his knife. Defendant then forced her to orally copulate him and masturbated her with a pop bottle, laughing when she cried out in pain and began to bleed. Kim P. stated that defendant scratched her breast with his knife, hit her on her chest and face with his fists and told her that he “liked hurting women because it turned him on.” Defendant took her underclothes for his “collection,” and also took identification cards from her wallet, warning her that he would find her and kill her if she told anyone of the incident. Kim P. finally escaped from defendant’s car and as she fled she heard defendant threaten to kill her if she told anyone.[3]
Defendant did not deny committing the killings, but attempted to present a diminished capacity defense, calling a number of lay witnesses—including his sister and a neighbor—who testified that from childhood defendant had been mentally slow and clumsy, and that when teased or disappointed, he would “fly off the handle.” An attorney who had represented defendant in the criminal proceedings arising out of the Kim P. incident (see fn. 3, ante) testified that in his opinion defendant was a mentally disordered sex offender (MDSO) even though he had been found not to be one in the prior proceedings.
Dr. James Ramsaran, a psychiatrist who had reviewed defendant’s taped confessions and a report of a 1954 neurological examination of defendant conducted by a Dr. Guy Hunt when defendant was nine years old, and who had also examined defendant one evening during the trial, testified on direct examination that in his opinion defendant had not premeditated either homicide, and that the killings were a reaction of rage and fury to Litzau’s epithets and Gloe’s statement that she would report him to the police. The doctor stated that his opinion was based in part on the fact that during his interview defendant told him that he did not recall the details of the killings. Dr. Ramsaran also testified that during his interview defendant had admitted 16 other rapes in 1976 and 1977 and that his eyes “lit up” as he described them. On cross-examination, the doctor conceded that it was quite possible that defendant had acted in a *34 premeditated and deliberate manner in killing the victims and that if defendant was in fact capable of remembering the events of the killings in detail he might well change his opinion.
The defense also called Oren McEuen, a psychologist, who had conducted a number of therapy sessions with defendant in October 1977, during the period in which the two killings took place; the sessions were a condition of defendant’s probation for the Kim P. incident. McEuen’s testimony did not prove helpful to the defense, for he testified that in his opinion defendant could premeditate and deliberate the killings, and could also form the intent to rape, rob and kidnap the victims.
In rebuttal to the defendant’s diminished capacity defense—such as it was—the prosecution called two psychiatrists, Dr. Gericke and Dr. Flanagan, who had examined defendant both in connection with the Kim P. incident and very shortly after his arrest for the Litzau and Gloe killings. Both doctors testified that in their opinion defendant suffered from no mental defect or diminished capacity, and could fully premeditate and deliberate the killings.
On the basis of the above evidence, the jury found defendant guilty of two counts of first degree murder and also found that nine of the thirteen charged special circumstances were true.[4]
■ At the penalty phase, a number of psychiatrists and psychologists who had examined defendant within the past two years testified on behalf of the prosecution that defendant was neither insane nor unable to reflect on the gravity of his acts leading to the victims’ deaths. The witnesses also indicated that in their opinion defendant was not mentally retarded but in the “borderline” to low normal intelligence range and that he was a danger to the community.
Defendant, in turn, presented a number of witnesses to show that his conduct was at least in part a product of a congenital mental defect. His mother, Lillian, testified that her son’s birth involved a long labor of 46 to 47 hours and that from early childhood he had always been much slower than her other children in learning to walk and talk, a backwardness that continued throughout his *35 schooling. She also testified to the instability in defendant’s life during his childhood, and the fact that he had been shifted back and forth between her home and his grandmother’s home while he was attending elementary and high school.
Myrtle Gage, who is married to defendant’s uncle, testified that she had known defendant well for the last two and a half years, and that whenever he was around children he would play and laugh with them and act as “one of them.” Patricia Irish, a probation officer who had investigated defendant in connection with his involvement in the Kim P. incident, testified that he seemed “childlike” concerning some aspects of the crime although he denied committing it. She also testified that she had recommended that defendant be sentenced to state prison because she believed he was violent and dangerous and she felt it had been a mistake to grant him probation with only a relatively short period of county jail time for the earlier offense.
Dr. Guy Hunt, a psychiatrist and neurologist who had examined defendant in 1954, when defendant was nine, examined him again on April 20, 1978, just before the penalty phase. He testified that on the basis of his examinations he concluded that defendant was mildly mentally retarded, probably due to injuries at birth. In his view defendant was presently functioning at the mental age of a 10- or 12-year-old, had an antisocial personality with deviant sexual drives and—while legally sane at the time of the offenses—was unable to comprehend the magnitude of his crimes or to exhibit normal remorse. Dr. Hunt stated that while he was in favor of the death penalty under certain circumstances, he did not think that penalty was appropriate in this case because defendant’s mental condition had not afforded him a chance to function in a normal fashion.
After the presentation of arguments and the giving of instructions, the jury began its deliberations on the question of penalty. The following day the jury returned a verdict of death. Thereafter, the trial court denied defendant’s motion for a new trial and reduction of penalty and entered a judgment providing for the imposition of the death penalty.
On appeal, defendant raises many claims of error with respect to guilt, special circumstances and penalty. In addition, during the pendency of the appeal, defendant filed a petition for habeas corpus, contending that his trial counsel provided constitutionally ineffective assistance at both the guilt and penalty phases of the trial. We issued an order to show cause in the habeas proceeding, and consolidated the two proceedings for oral argument. For convenience and clarity, the issues raised by the appeal and the habeas proceeding will be discussed together under the broad categories of “Guilt Issues,” “Special Circumstance Issues” and “Penalty Issues.”

*36
II. Guilt Issues

A. Failure to Instruct Jury Not to Consider Punishment at Guilt Phase
Defendant does not contend that the evidence was insufficient to support his conviction of two counts of first degree murder.[5]
 On appeal, he raises only a single claim with respect to guilt, contending that the trial court committed reversible error in failing to instruct the jury that in considering the question of guilt, it should not consider the subject of penalty. (Former CALJIC No. 8.86.5, now CALJIC No. 17.42.)[6] As defendant points out, the trial court intended to instruct on this matter, but, apparently through inadvertence, failed to read this one instruction to the jury when it read the other instructions at the guilt and special circumstance phase.[7]
The Attorney General concedes that the instruction in question was proper and should have been given, but maintains that the omission was not prejudicial. He points out that during voir dire the trial court informed the jury of the separate and distinct phases of the trial proceedings and that the prosecutor stressed that consideration of penalty was not relevant until the penalty phase. He argues that in light of the overwhelming evidence of defendant’s guilt, this minor error clearly .did not affect the verdict.
Defendant asserts that the jury’s relatively speedy resolution of the guilt and special circumstances issues—the deliberations lasted about three and one-quarter hours—indicates that the question of penalty played a large role in its deliberations and demonstrates that the jury must have concluded that in light of defendant’s dangerousness he should not “be allowed to get off with any penalty less than death.” It appears much more likely, however, that the relatively short duration of the jury’s deliberations simply reflected the strength of the prosecution’s case. The jury’s special circumstance findings—distinguishing between the attempted rape of Litzau and the actual rape of Gloe—refute any notion that the jury did not give individual consideration to each of the charged offenses and special circumstances. In light of the whole record, the error was *37 clearly nonprejudicial. (See People v. Lombardi (1962) 205 Cal.App.2d 803, 806 [23 Cal.Rptr. 325].)
B. Failure to Object to Admission of Defendant’s Confessions and Other Incriminatory Evidence
In his petition for habeas corpus, defendant attacks his trial counsel’s conduct of the guilt phase in a number of respects. We begin with the claims related to the allegedly improper admission of defendant’s detailed confessions and the incriminating evidence found on his person and in his apartment at the time of his arrest.[8]
B.l. Alleged Ramey Error
As noted, a few days after Gloe’s death, a witness who had seen her enter a car on the night of her disappearance spotted the same car parked in a gas station. Employees at the gas station directed police to an apartment complex a few miles away, and the police located the car in a parking lot adjacent to the complex. A records’ check revealed that the car was registered to Fred Goodin who lived in the complex. The police contacted Goodin and he told them that the car belonged to defendant, his stepson, who lived in a different apartment in the same complex. Goodin also told the police that defendant was on probation for rape.
Accompanied by Goodin, the police went to defendant’s apartment and knocked on his door. When defendant opened the door, the police informed him that they were investigating a crime and asked if he would accompany them to the parking lot to identify a car. Defendant agreed, stepped inside to get a coat and went with the officers to the parking lot. When they reached the car, one officer asked if it was his. Defendant said it was, and also acknowledged that he was on probation for rape. The police then placed him under arrest.
Defendant contends that on the basis of these facts—largely revealed in the police reports—his trial counsel should have recognized that the police violated this court’s decision in People v. Ramey (1976)16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333] in arresting him without first obtaining a warrant. Unlike in Ramey, however, here the police did not enter defendant’s home to make a warrantless arrest; in fact, the police did not enter his apartment at all before the arrest but rather arrested defendant in the parking lot.
*38 Defendant maintains, however, that the police utilized a “ruse” to lure him out of his apartment so that they could “evade” Ramey and make a warrantless arrest, and he argues that Ramey should be extended to forbid such a ruse. We need not decide in this case whether the use of a ruse to avoid entry into a house is impermissible, because the facts upon which defendant relies simply do not support the suggestion that in this case the police used a ruse. While defendant contends that when the police approached his apartment they had probable cause to arrest him and clearly intended to do so, the police report suggests that at that time the police knew only that the car in question was registered to Goodin, and that Goodin—himself a possible suspect and not a tested “reliable” informant—had stated that defendant had been driving the car. Moreover, even if the police had probable cause to arrest defendant when they knocked on his door, it is not at all clear that they would have arrested him if he had not admitted—in the parking lot—that the car in fact was his. Under these circumstances, we conclude that trial counsel was clearly not ineffective in failing to raise this issue. (See People v. Evans (1980) 108 Cal.App.3d 193, 195-196 [166 Cal.Rptr. 315].)
B.2. Failure to Suppress Defendant’s Identification of Car
Defendant also contends that trial counsel was deficient in failing to object to the introduction of his statement to a police officer, just before his arrest, in which he confirmed that the suspect car was his. He contends that because the police did not give him Miranda warnings before asking whether the car belonged to him, his response was elicited in violation of Miranda and should have been suppressed.
Even assuming that the police had probable cause to arrest defendant before he admitted that the car was his, the police were not required to give Miranda warnings before asking the single question under the noncoercive circumstances present here. In People v. Blouin (1978) 80 Cal.App.3d 269, 282-283 [145 Cal.Rptr. 701], the Court of Appeal upheld the validity of a statement given to police under similar circumstances, explaining: “The interrogation was conducted on the street in front of defendant’s home with no evidence of the ‘coercive environment’ discussed in Oregon v. Mathiason [(1977)] 429 U.S. 492, 495 [50 L.Ed.2d 714, 719, 97 S.Ct. 711]. The questioning was short in duration and was not accusatory in nature. ...” Here, Robertson had voluntarily accompanied the police officers to the parking lot and there were no apparent circumstances from which he could reasonably conclude that he was “in custody” at the time the question was posed. Under these circumstances, Miranda warnings were not required. (See also In re Danny E. (1981) 121 Cal.App.3d 44, 49-50 [174 Cal.Rptr. 123]; cf. People v. Herdan (1974) 42 Cal.App.3d 300 [116 Cal.Rptr. 641].)
*39 B.3. Failure to Suppress Confessions Under Miranda
In a declaration accompanying his first habeas petition, defendant stated that, contrary to the indication in the record on appeal, he had refused to waive his Miranda rights immediately after his arrest and that the officers had ignored his refusal, continued the interrogation and improperly elicited his confessions. Defendant also stated that he had informed his trial counsel of these facts prior to trial, but that counsel had failed to object to the introduction of his confessions on this ground. Since these factual allegations clearly presented a prima facie case of incompetency, we appointed a referee to hold an evidentiary hearing.
After a lengthy hearing, the referee found that at the time he was initially advised of his Miranda rights after arrest, defendant waived those rights. The referee also found, however, that at some point after his initial waiver but before he confessed—either at his apartment or in a police vehicle on the way to the sheriff’s office where the confession was given—defendant told the police that he wished to talk to a Mr. McEuen before talking with the officers. McEuen, it will be recalled, was the psychologist whom defendant was then seeing on an out-patient basis as a condition of his probation.
As soon as the police and defendant arrived at the sheriff’s office about 2 a.m., one of the officers made a number of telephone calls in an attempt to locate McEuen but could not reach him at that time. The referee found that the officer then told defendant he could not locate McEuen, that he asked defendant whether he wanted to talk and that defendant replied that “he might as well.”[9] Thereafter, Miranda warnings were again given and defendant’s detailed, tape-recorded and filmed confessions followed.
Defendant now contends that by requesting to speak to McEuen before talking to the officers, he invoked his Fifth Amendment right to remain silent and that the officers violated Miranda in thereafter reinitiating the interrogation by asking if he wanted to talk. In Fare v. Michael C. (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560], however, the United States Supreme Court —reversing this court’s decision in In re Michael C. (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7]—rejected a very similar contention and found that the juvenile in that case had not automatically invoked his right to remain silent under Miranda by requesting to speak to his probation officer before talking to *40 the investigating police officers. Distinguishing “[t]he per se aspect of Miranda” which comes into play when a suspect requests to speak to an attorney (see 442 U.S. at pp. 718-719 [61 L.Ed.2d at p. 209]; see also Edwards v. Arizona (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378, 386, 101 S.Ct. 1880]), the Fare court concluded that the determination of whether a defendant’s request to speak to someone other than an attorney represents an invocation of his right to remain silent must “be made upon an inquiry into the totality of the circumstances surrounding the interrogation . . . .” (442 U.S. at p. 725 [61 L.Ed.2d at p. 212].) Applying this “totality of the circumstances” standard to the facts in Fare, the Supreme Court concluded that the juvenile had knowingly and voluntarily waived his rights and that his subsequent confession was admissible. On remand to this court, we affirmed the judgment of conviction, by minute order dated April 1, 1980, on the basis of the United States Supreme Court decision.
In light of the decision in Fare, it seems clear that there was no violation of Miranda in the present case. Here, the record shows that the accused was an adult who had been involved in criminal proceedings in the past and who had invoked his right to remain silent during the police investigation of his earlier crimes. Thus, he apparently knew his rights and how to invoke them. In addition, there is absolutely no evidence of any coercion: the police officer here attempted to contact the person to whom defendant wanted to speak and, after informing defendant that McEuen could not be located at that time, simply asked defendant whether he nonetheless wanted to talk. When he answered affirmatively, the police again fully advised him of his Miranda rights, which he explicitly waived. Under these circumstances, defendant’s trial counsel clearly did not withdraw “a potentially meritorious defense” (see People v. Pope (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) in failing to move to suppress defendant’s confession under Miranda.
C. Failure to Object to Kim P. ’s Statement That Defendant Told Her “that he had killed two others”
Defendant next claims that trial counsel was ineffective in failing to object to a portion of Kim P.’s testimony.
As noted, Kim P. testified on behalf of the prosecution that she was sexually assaulted by defendant in May 1976, more than a year before the two murders which are the subject of this case. On direct examination, the district attorney asked Kim P.: “During this period of time that he [defendant] was cutting off your clothes, did he say anything about any other girls?” She responded: “Yes. He told me that he had killed two others and that they hadn’t found them yet—that they didn’t find him yet.” On cross-examination, she reiterated that defendant made this statement.
*41 This testimony before the jury came as no surprise to defendant’s trial counsel. When Kim P. was initially called as a witness, counsel had objected to her entire testimony on the ground that defendant’s prior criminal act could not be admitted to show defendant’s bad character. (Evid. Code, § 1101, subd. (a).) On voir dire, the prosecution took Kim P. through her proposed testimony, and the trial court ultimately concluded that her testimony was admissible, finding that the prior criminal activity was sufficiently similar to the charged crimes and was relevant to the issue of defendant’s mental state at the time of the present offenses. During her voir dire, Kim P. specifically stated that defendant had told her that he had killed two other women, so defense counsel had ample opportunity to move for the exclusion of this statement.
Defendant now maintains that his trial counsel rendered constitutionally ineffective assistance in failing to object specifically to Kim P.’s testimony concerning his statement. In a declaration filed in response to the habeas petition, trial counsel does not suggest any tactical reason for his failure to object, but states that he did not object “because there was no basis for objection.”
As defendant asserts, trial counsel is simply wrong in maintaining that there was no basis on which to object to the testimony in question. First, Kim P.’s testimony concerning defendant’s admission of two other murders was objectionable on the ground that no independent evidence of the corpus delicti of those crimes was ever introduced. California has long adhered to the rule, established at common law and followed in most jurisdictions, that “evidence of the commission of a prior crime may not be proved by the introduction of evidence of an extrajudicial admission without proof aliunde that such a crime had been committed.” (People v. Nye (1969) 71 Cal.2d 356, 367 [78 Cal.Rptr. 467,455 P.2d 395]; see, e.g., People v. Quicke (1969) 71 Cal.2d 502, 520 [78 Cal.Rptr. 683, 455 P.2d 787]; People v. Hamilton (1963) 60 Cal.2d 105, 129 [32 Cal.Rptr. 4, 383 P.2d 412]; People v. Cullen (1951) 37 Cal.2d 614, 624 [234 P.2d 1].)
The Attorney General concedes that Kim P.’s testimony could not properly be received as an admission by defendant of two other homicides. He contends, however, that her statement was not introduced to prove that defendant had committed other murders but rather was simply “offered to demonstrate factors that went to [Kim P. ’s] state of mind and the context of her rape. Obviously her actions, reactions and omissions were important to the jury’s assessment of her credibility. As such the words were admissible.”
The record does not reflect the prosecution’s motivation in eliciting this testimony from Kim P. Even if the statement was theoretically admissible for the limited purpose the Attorney General suggests, however, there seems *42 little question but that the statement’s prejudicial effect far outweighed its probative value in this regard, and that—upon proper objection—the statement should have been excluded under Evidence Code section 352. At the time the statement in question was elicited, Kim P. had already testified that defendant had held a knife at her throat and had threatened to kill her if she did not cooperate. The People hardly needed this additional testimony to afford the jury an accurate picture of Kim P.’s “state of mind” or plight. Given the obvious potential for prejudice arising from the fact that the jury might improperly consider the defendant’s statement as proof that he had previously killed two other women, we think that the statement should clearly have been excluded. (See e.g., United States v. Wiggins (D.C.Cir. 1975) 509 F.2d 454, 462.) Moreover, in light of the obvious danger of prejudice and the absence of any tactical advantage to be served by the statement’s admission, it appears that trial counsel failed to render reasonably competent assistance in not objecting to its admission.
The question remains whether counsel’s error warrants a reversal of the judgment of guilt or of the special circumstances findings. The testimony in question was by no means de minimis or insignificant. In this case, defendant was charged with sexually assaulting and killing two women, and the jury might have interpereted the statement that should have been excluded as evidence that defendant had sexually assaulted and killed two other women more than a year before the charged offenses. In many instances the improper admission of such a statement might well be prejudicial on the question of guilt.
In the present case, however, the evidence was so overwhelming as to both guilt and special circumstances that we conclude that reversal on these issues is not warranted. As we have seen, defendant gave a full and detailed tape-recorded confession to both homicides, and then reenacted the crimes on film. The evidence to support defendant’s principal defense—diminished capacity —was very weak. Under these circumstances, we conclude that it is not reasonably probable that trial counsel’s error affected the jury’s determination on the guilt or special circumstances issues.
D. Failure to Properly Investigate and Present Mental Defense
At trial, defendant presented a diminished capacity defense through several lay and expert witnesses. Defendant now contends that trial counsel was ineffective in the investigation and presentation of this mental defense, asserting that counsel (1) improperly failed to contest the removal of his first appointed psychiatrist, Dr. Oshrin, for an alleged conflict-of-interest, (2) prematurely terminated the services of his second appointed psychiatrist, Dr. Levin, before Levin had personally interviewed defendant (see People v. Bassett *43 (1968) 69 Cal.2d 122, 142 [70 Cal.Rptr. 193,443 P.2d 777])10 and (3) failed to locate Dr. Hunt in time for him to testify at the guilt phase.[11]
Although trial counsel’s pretrial preparation of the diminished capacity defense apparently left much to be desired, defendant has failed to demonstrate that counsel’s failings either withdrew a potentially meritorious defense (see People v. Pope, supra, 23 Cal.3d at p. 425) or otherwise probably affected the guilt verdicts or special circumstance findings. As we have seen, defendant did ultimately present a diminished capacity defense through lay witnesses and through Dr. Ramsaran, a psychiatrist, who personally examined the defendant and testified that in his opinion the killings were not premeditated. Defendant presents nothing to suggest that either Dr. Oshrin or Dr. Levin were likely to have testified in any more favorable a manner than did Dr. Ramsaran. Furthermore, while it appears from Dr. Hunt’s testimony at the penalty phase that his testimony may have been somewhat more favorable to defendant than that of Dr. Ramsaran, the jury at the guilt phase was informed by Dr. Ramsaran of Dr. Hunt’s earlier diagnosis of defendant as “mildly mentally retarded” and, of course, at the penalty phase the jury returned a verdict of death despite Dr. Hunt’s testimony. Given the substantial prosecution evidence refuting defendant’s contention that he did not have the capacity to premeditate or deliberate the killings, and the absence of any showing of potentially significant *44 testimony that defense counsel could and should have presented, we conclude that defendant has failed to demonstrate that trial counsel’s shortcomings in this area warrant reversal of his convictions or of the special circumstance findings.
E. Counsel’s Statements on Voir Dire
Defendant next complains of a number of statements, which his trial counsel made during the voir dire of the jury.
On three occasions defense counsel informed a potential juror that defendant was in custody, stating in one instance “[t]he sheriff is sitting here keeping a good close eye on him at all times.” Although defendant contends that “[cjompetent counsel would not have made mention of such damaging matters to a jury deciding a client’s fate,” when the remarks are read in context it is clear that because trial counsel felt that the jury would inevitably recognize defendant was in custody, he simply sought to minimize the potential prejudice by revealing defendant’s custody status himself and questioning prospective jurors as to the effect it would have on their perceptions of defendant. Under the circumstances, we think counsel engaged in reasonable trial tactics.
On another occasion, defense counsel—after inquiring whether a prospective juror understood that the decision to impose the death penalty “may rest with you”—was asked: “What goes beyond that? There are further appeals?” While emphasizing “[tjhat administratively and judicially [that] will be out of your hands,” counsel did admit that “[tjhere are always reviews.” Defendant contends that counsel was incompetent in so responding, noting the general rule that the “jury [has] no concern with and should not be informed of tiie automatic appeal where judgment of death is imposed.” (People v. Linden (1959) 52 Cal.2d 1, 26-27 [338 P.2d 397].) Although we agree that it is of utmost importance that a juror’s sense of responsibility in a death case not be diluted by reference to available appeals, in this case we do not think counsel can be faulted for his immediate, cautious response to a potential juror’s question, and we cannot find that counsel’s comment prejudiced the guilt or special circumstance verdicts.
F, Failure to Object to Prosecutor’s Guilt Argument
Defendant’s final contention with respect to the guilt phase is that trial counsel was incompetent in failing to object to several of the prosecutor’s statements during closing argument, one in which the prosecutor allegedly improperly alluded to the question of penalty, and others in which the prosecutor assertedly erroneously informed the jury that diminished capacity was an “excuse” which might potentially “reduce” a first degree murder to a lesser offense.
*45 Taken in context, it is not clear that the first statement to which defendant refers actually was directed to the issue of penalty.[12] Even if the statement was improper in this respect, however, we do not think that it is reasonably probable that its exclusion would have affected the outcome as to guilt or special circumstances.
Second, whatever temporary confusion may have resulted from the prosecutor’s occasional reference to “excuse” in connection with diminished capacity was presumptively cured by the trial court’s proper detailed instruction on the point. Again, we cannot find that any failing of trial counsel in this regard warrants the reversal of the guilt verdicts.
III. Special Circumstance Issues
A. Alleged Invalidity of “Urgency” Status of 1977Death Penalty Statute
As stated at the outset, this case was prosecuted under the 1977 death penalty statute enacted by the Legislature as an urgency measure in August 1977. (Stats. 1977, ch. 316, § 26, p. 1266.) Under the California Constitution, an urgency statute becomes effective immediately upon enactment (Cal. Const., art. IV, § 8, subd. (c)(2)), and thus, by virtue of its urgency status, the legislation was effective in October 1977 when the crimes involved in this case occurred.
Defendant contends, however, that the 1977 statute could not properly be enacted as an urgency statute, and thus could not lawfully go into effect until January 1, 1978. He thus maintains that the law—with its special circumstance and death penalty provisons—cannot apply to the crimes in this case. (See People v. Teron (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773].) Defendant relies on two separate arguments to support his contention. Neither is tenable.
*46 Defendant initially contends that article I, section 27 of the California Constitution—the constitutional provision enacted by initiative after this court’s decision in People v. Anderson (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]—forbids the enactment of any death penalty legislation as an urgency statute. Defendant relies on the following language of article I, section 27: “All statutes of this state in effect on February 7, 1972, requiring, authorizing, imposing or relating to the death penalty are in full force and effect, subject to legislative amendment or repeal by statute, initiative or referendum. ” (Italics added.) He argues that in providing that future death penalty laws were to be subject to the electorate’s referendum power, article I, section 27 intended to preclude the Legislature from adopting any death penalty statute that is not subject to referendum, as is the case with an urgency statute. (See Cal. Const., art. II, § 9, subd. (a).)
In our view, however, neither the language of the constitutional provision nor the relevant “legislative history” supports defendant’s reading of the section. In providing that the death penalty statutes reinstated in 1972 were “subject to legislative amendment or repeal by statute, initiative or referendum,'’’’ the section gives no indication that it intended to preclude the enactment of urgency legislation, a process that is part and parcel of this state’s constitutionally sanctioned legislative process. (Cal. Const., art. IV, § 8, subd. (d).) Nor does the section purport to expand the scope of the normal constitutional referendum power, which has traditionally been inapplicable to urgency legislation. (See Cal. Const., former art. IV, § 1 (1911 Amend.).) Finally, we find absolutely nothing in the election brochure arguments accompanying this provision to suggest that the drafters of this section intended to preclude the Legislature from dealing in the death penalty area on an urgency basis. (See Ballot Pamp., Proposed Amends, to Cal. Const, with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 17, p. 2.)
Defendant’s second challenge to the urgency status of the 1977 law is equally unavailing. Article IV, section 8, subdivision (d) of the California Constitution, the general provision on urgency statutes, provides in part that “[a]n urgency statute may not create or abolish any office or change the salary, term or duties of any office . . . .” (Italics added.) Defendant contends that the 1977 statute runs afoul of this provision by “changing the duties” of this court as a whole and of the Chief Justice in particular. Defendant points to the provisions of the 1977 law which (1) “imposed upon the Supreme Court as a whole the duty to decide cases within 150 days of record certification” and (2) “imposed upon the Chief Justice the duty to ‘state on the record the extraordinary and compelling circumstances causing the delay and the facts supporting these circumstances’ whenever the 150-day limitation is not met.” (§ 190.6.)[13]
*47 In interpreting this constitutional limitation on urgency legislation in Martin v. Riley (1942) 20 Cal.2d 28, 37 [123 P.2d 488], however, our court explained that “[a]n addition or subtraction in relation to the volume of the duties required to be performed by an officer, which does not substantially affect the primary duties of his office, is not such a change of duties as would prevent immediate effectiveness of legislation properly declared to be urgent.” (Italics added; see also Flournoy v. Priest (1971) 5 Cal.3d 350, 354 [95 Cal.Rptr. 793, 486 P.2d 689].) Our court has traditionally exercised initial appellate jurisdiction in death penalty cases, and although the 150-day provision to which defendant refers is new, section 190.6 itself recognizes that its deadline is not inflexible but may be extended whenever “extraordinary and compelling circumstances” so demand—as, we have come to recognize, they almost invariably do. -Moreover, the Chief Justice’s added duties with respect to stating on the record the circumstances for any delay cannot realistically be said to “substantially affect the primary duties of [her] office” under Martin.
Thus, neither of defendant’s challenges to the urgency status of the 1977 legislation has merit. The statute was in effect when the crimes at issue were committed.
B. Failure to Charge Robbery, Rape and Kidnaping as Separate Crimes
Defendant contends that the jury’s special circumstances findings relating to murder in the course of robbery, rape and kidnaping must be reversed because the prosecution failed to charge defendant with the robberies, rapes and kidnapings as separate crimes. He relies on the portion of section 190.4 which reads: “Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.”
In People v. Velasquez (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], the defendant raised an identical contention in an attempt to invalidate a special circumstance finding of murder during the commission of a robbery. In that case we held that while “[t]he literal language of section 190.4 supports defendant’s contention^] [t]he failure to charge robbery as a separate crime . . . was clearly not prejudicial since the information notified defendant that he must defend against the special circumstances of a premeditated killing com *48 mitted during the commission of a robbery.” (26 Cal.3d at p. 434, fn. 6.) The information in this case similarly notified defendant of all the special circumstances against which he had to defend, and thus, as in Velasquez, no prejudice appears.
C. Sufficiency of Evidence of Premeditation and Deliberation
Eight of the nine special circumstances which the jury found to be true were necessarily based in part on a finding that the murders of both Litzau and Gloe were “willful, deliberate and premeditated.” (Former § 190.2, subds. (c)(3) and (c)(4).)[14]
 Although the jury was properly instructed in this regard, defendant maintains that these special circumstances findings must be reversed on the ground that the evidence presented at trial is insufficient as a matter of law to demonstrate premeditation and deliberation.
Defendant relies on this court’s decision in People v. Anderson (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942]. In Anderson, the defendant killed the 10-year-old daughter of a family with whom he was living, in a brutal assault in which numerous cuts were inflicted all over the child’s body. There were no eyewitnesses to the crime, the defendant did not testify or confess, and there was no explanation of what led up to the murder although there was evidence of the defendant’s subsequent efforts to conceal the crime. On this record, our court concluded that the evidence was insufficient to demonstrate that the murder was premeditated or deliberate, and we reduced the conviction from first to second degree murder.
In invoking Anderson in this case, defendant relies in particular on the court’s statement that “[i]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. ‘If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.’ [Citations.]” (Id., 70 Cal.2d at p. 24-25 (quoting People v. Caldwell (1955) 43 Cal.2d 864, 869 [279 P.2d 539]).) Comparing the physical evidence of the murders in this case with that in Anderson, defendant contends that the evidence suggests that the killings here resulted from “an ‘explosion of violence’ . . . more consistent with a lesser grade of homicide than premeditated murder.” (People v. Smith (1973) 33 Cal.App.3d 51, 64 [108 Cal.Rptr. 698].)
*49 Although the manner of the killings here—multiple stabbings—is somewhat similar to that in Anderson, defendant overlooks the considerable differences between the state of the evidence in the two cases. In finding the evidence insufficient to show deliberation or premeditation in Anderson, we emphasized that “we do not have any evidence of either (1) any conduct by defendant prior to the killing which would indicate that he was planning anything, felonious or otherwise, or (2) any behavior towards [the victim] from which the jury could reasonably infer that defendant had a ‘motive’ or desire to .sexually attack and/or kill her.” (70 Cal.2d at p. 32.) In this case, by contrast, there is, of course, overwhelming evidence of felonious, sexually motivated violent conduct planned and executed by the defendant prior to the killings, and also abundant evidence of his motive to kill in reponse to the victims’ epithets'and threats to report him to the police.
In this regard, this case appears much closer to People v. Quicke (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617, 390 P.2d 393] and People v. Stroble (1951) 36 Cal.2d 615 [226 P.2d 330]—two cases discussed by the Anderson court—than to Anderson itself. In Quiche and Stroble, the defendants killed young women who refused to capitulate to their planned sexual assaults; in both cases, we upheld first degree murder convictions. In Anderson we reaffirmed these holdings, recognizing that such facts could reasonably support jury findings qf premeditation and deliberation. (70 Cal.2d at pp. 27-28, 29-30.)
Defendant contends that his confessions demonstrate that he did not intend to kill the two victims when he first picked them up but simply intended to force them to have sex with him. He argues that in light of this evidence, the record is insufficient, as a matter of law, to prove that the killings were deliberate and premeditated, and rather demonstates that the killings were sudden “explosions of violence” in response to Litzau’s epithets and Gloe’s threat to “snitch” on him. In response, the Attorney General argues that the evidence—including Kim P.’s testimony—is sufficient to support a finding that defendant had planned from the outset to kill the victims if they did not accede to his demands or if they threatened to report him to the police. (Cf. People v. Quicke, supra, 61 Cal.2d at pp. 158-159.)
We need not determine whether the evidence is sufficient to support a finding of premeditation and deliberation on the ground that defendant had contemplated the possibility of killing his victims from the outset, for even if—as defendant contends—his intent to kill was not arrived at until Litzau’s epithets and Gloe’s threat to turn him into the police, the jury could still have found on this record that the killings were premeditated and deliberate. As this court explained in People v. Thomas (1945) 25 Cal.2d 880, 900 [156 P.2d 7]: “Neither the statute nor the court undertakes to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an in *50 tent which is truly deliberate and premeditated. . . . The true test is not the duration of time as much as the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . .
From his confession, the jury could have concluded that defendant formed the considered intent to kill both Litzau and Gloe when each acted in a manner which suggested likelihood that she would report defendant’s crime to the police, and that he immediately carried out his intent to prevent any such disclosure. While the evidence also suggests that defendant intended to cause the victims great and prolonged pain, that motivation is in no way inconsistent with a finding of a deliberate and premeditated intent to kill. Indeed, portions of defendant’s confession leave no doubt of defendant’s conscious, considered decision to kill.[15] Under these circumstances, we think the evidence is sufficient to support a finding that the killings were willful, premeditated and deliberate. (See, e.g., People v. Stroble, supra, 36 Cal.2d 615, 618-620; People v. Hillery (1965) 62 Cal.2d 692, 704-705 [44 Cal.Rptr. 30, 401 P.2d 382].)[16]
D. Validity of “Torture” Special Circumstance Findings
Defendant challenges the jury’s “torture” special circumstance findings on two grounds, arguing (1) that the trial court’s instructions were inadequate, and (2) that, in any event, the evidence was insufficient to support the findings. Neither contention has merit.
Former section 190.2, subdivision (c)(4) provided that a special circumstance exists if “[t]he murder was willful, deliberate and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain. ” The jury was given an *51 instruction defining torture in the statutorily designated terms, but defendant contends that the trial court erred in not supplementing this definition with CALJIC No. 8.24, which defines torture for purposes of section 189. CALJIC No. 8.24, drafted to conform to this court’s section 189 torture decisions (see, e.g., People v. Tubby (1949) 34 Cal.2d 72, 77 [207 P.2d 51]; People v. Wiley (1976) 18 Cal.3d 162, 167-173 [133 Cal.Rptr. 135, 554 P.2d 881]), states that a finding of torture requires that “the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose.”
To the extent that these two similar instructions do differ, the trial court did not err in defining torture in the terms specifically provided by former section 190.2, subdivision (c)(4). The definition of torture in CALJIC No. 8.24 reflects simply a definition adopted by the courts in the absence of a legislative definition of torture in section 189. Within constitutional limits, the Legislature remains free to define “torture” for special circumstances purposes as it sees fit, and since it did provide an explicit definition in the 1977 death penalty statute, the trial court properly viewed the legislative definition as controlling.
Defendant additionally contends that the evidence at trial is insufficient to support the jury’s finding of torture, asserting that the evidence does not show any intent to inflict extreme and prolonged pain, but rather simply indicates that the killings “were the result of an impulsive flurry of violence.” In our view, however, the jury could well find from (1) the details given in defendant’s confession,[17] (2) the condition of the victims’ bodies, and (3) Kim P.’s testimony of defendant’s declared desire to cause pain to women, that defendant had carried out the killings with an intent to inflict extreme and prolonged pain on both victims. Thus, we reject defendant’s challenge to the torture special circumstance findings.
E. Validity of “Murder in the Commission of a Robbery" Special Circumstance Findings
Defendant’s final contention with respect to special circumstances concerns the jury’s findings that the murders in this case occurred during the commission of robbery within the meaning of former section 190.2, subdivision (c)(3)(i).
Defendant first contends that the evidence was insufficient to support such findings under People v. Green (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 *52 P.2d 468]. In Green, the defendant had intentionally killed his wife, and before and after the murder had taken all of her clothing in an apparent preconceived plan to conceal the crime. Although the taking of his wife’s clothing by force constituted a technical robbery, we concluded that the circumstances of that case did not constitute “a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder.” (Id., at p. 60.) Recognizing that “[a]t the very least ... the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not,” we concluded that such a goal “is not achieved . . . when the defendant’s intent is not to steal but to kill and the robbery is merely incidental to the murder . . . because its sole object is to facilitate or conceal the primary crime.” (Id., at p. 61.) In holding that such an “incidental” robbery would not provide a proper basis for a special circumstance finding, we specifically contrasted that case with one in which a defendant “kill[s] in cold blood in order to advance an independent felonious purpose, e.g., . . . carrie[s] out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape.” (Ibid.)
In the present case, the jury could reasonably have concluded from Kim P. ’s testimony and from the collection of women’s underwear found under defendant’s bed that from the outset of both incidents defendant harbored the intent to steal some of the victims’ underwear or other personal property as well as the intent to assault them sexually. Unlike in Green, such an intent to steal was entirely independent of the murders and was not planned simply as a means of concealing the killings. Because the jury could also reasonably have found that defendant killed both victims when he became afraid that they would report his intended crimes, this case appears to fall within the class of cases as to which—under Green’s analysis—the “felony-murder” special circumstance of the 1977 statute may properly apply.
Defendant additionally argues that even if there is sufficient evidence to support the robbery special-circumstance findings, the findings should nonetheless be reversed because the trial court failed to instruct the jury sua sponte on the “incidental robbery” theory enunciated in Green. In light of the significant differences between the facts of this case and the facts of Green, however, we do not believe that that case’s “incidental robbery” doctrine can properly be characterized as a general principle of law “closely and openly connected with the facts before the court” (See People v. St. Martin (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166,463 P.2d 390]; People v. Sedeno (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913]) as to which a sua sponte duty to instruct could arise.
Accordingly, we reject defendant’s challenge to the robbery special circumstance findings.
*53 IV. Penalty Issues
As with guilt and special circumstances, defendant raises numerous claims of error with respect to the penalty phase. We conclude that at least one of defendant’s penalty contentions is valid and requires a remand for a new penalty trial.
A. Instructional Error on “Other Crimes” Evidence
As discussed above, at the guilt phase the prosecution introduced evidence from which the jury could find that—in addition to the two murders ¡with which he was charged in the present case—defendant had committed other violent crimes in the past. Kim P.’s testimony concerning the numerous criminal acts defendant allegedly committed against her was, of course, the most obvious of the “other crimes” evidence. In addition, the jury could also have understood Kim P.’s statement that defendant had told her that he had killed “two others” to constitute evidence of additional crimes committed by defendant.
The prosecution did not introduce any additional other crimes evidence at the penalty phase, but the jury was instructed that in arriving at its penalty determination it could consider evidence admitted at all phases of the trial proceedings. In addition, pursuant to former section 190.3’s enumeration of aggravating and mitigating circumstances, the jury was specifically instructed that in determining penalty it should “take into account ... the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.”
Defendant contends that the trial court committed prejudicial error in failing to instruct the jury sua sponte that in determining whether he should live or die, it could not properly consider the “other crimes” evidence as aggravating circumstances unless it first found that these crimes had been proven beyond a reasonable doubt. He points out that over a decade ago this court explained that “[i]t is now settled that a defendant during the penalty phase of a trial is entitled to an instruction to the effect that the jury may consider evidence of other crimes only when the commission of such other crimes is proved beyond a reasonable doubt. [Citations.]” (People v. Stanworth (1969) 71 Cal.2d 820, 840 [80 Cal.Rptr. 49, 457 P.2d 889].) Furthermore, Stanworth also makes it clear that such an instruction is “vital to a proper consideration of the evidence, and the court should so instruct sua sponte. ” (Id., at p. 841; see, e.g., People v. Polk (1965) 63 Cal.2d 443, 452 [47 Cal.Rptr. 1, 406 P.2d 641]; cf. People v. McClellan (1969) 71 Cal.2d 793, 804-806 [80 Cal.Rptr. 31, 457 P.2d 871].)
*54 The Attorney General recognizes the line of California authority requiring the giving of such an instruction at the penalty phase of a death penalty case. He argues, however, that it is inapplicable to cases tried under the 1977 death penalty statute because there is nothing in that legislation which suggests that the Legislature intended to adopt the reasonable doubt standard for “other crimes” evidence. Nothing in the 1977 legislation or its legislative history, however, purports to overturn or reject the numerous judicial decisions’ recognizing the applicability of the reasonable doubt standard in this special context,[18] and the rationale for our adoption of the reasonable doubt standard—the overriding importance of “other crimes” evidence to the jury’s life- or-death determination (see People v. McClellan, supra, 71 Cal.2d 793, 804, fn. 2)—applies equally to the penalty determination under the 1977 death penalty statute. Under these circumstances, we conclude that the 1977 statute cannot be interpreted to repeal this line of authority sub silentio. Accordingly, the trial court erred in failing to instruct the jury on this matter.
We also conclude that in this penalty phase context the error must be considered prejudicial. In light of the broad discretion exercised by the jury at the penalty phase of a capital case the difficulty in ascertaining “[t]he precise point which prompts the [death] penalty in the mind of any one juror” (People v. Hines (1964) 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398]), past decisions establish that “any substantial error occurring during the penalty phase of the trial . . . must be deemed to have been prejudicial.” (People v. Hamilton (1963) 60 Cal.2d 105, 135-137 [32 Cal.Rptr. 4, 383 P.2d 412]; People v. Hines, supra, 61 Cal.2d at pp. 168-170.) Here, the potential for prejudice was particularly serious because the error in question significantly affected the jury’s consideration of “other crimes” evidence, a type of evidence which this court long ago recognized “may have a particularly damaging impact on the jury’s determination whether the defendant should be executed.” (People v. Polk, supra, 63 Cal.2d at p. 450.)
The danger of prejudice was perhaps most pronounced with respect to defendant’s alleged confession to Kim P.—a year before the two homicides involved in this case—that “he had killed two others”—a confession which, but for counsel’s inexplicable failure to object, never should have been before the jury.
*55 The People argue that the jury may not have interpreted this statement as evidence that defendant had killed two other women but may have viewed it simply as an unfounded threat to Kim P.; they emphasize, in this regard, that the prosecutor did not discuss this remark in his closing argument at the penalty phase. The jury was specifically instructed at the penalty phase, however, that “[testimony which you believe given by one witness is sufficient for the proof of any fact. . . .” Given the similarity between the crimes which defendant allegedly bragged about in his threats to Kim P. and the crimes of which he had just been convicted, we cannot gamble a life on the possibility that the evidence concerning the two previous murders did not sway a single juror toward the death penalty.[19]
Moreover, the absence of any “other crimes” reasonable doubt instruction may also have had a significant effect on the jury’s consideration of the testimony concerning defendant’s crimes against Kim P. herself. While the jury was informed that defendant had pleaded guilty to one count of forcible oral copulation arising out of that incident, Kim P.’s testimony suggested that defendant had committed a great number of additional violent crimes against her, including kidnaping, aggravated assault and robbery. The prosecutor stressed this incident in his penalty phase argument,[20] but the jury was never told that it could only consider the various criminal aspects of the Kim P. incident of which he had not been convicted if it found that such other crimes had been proven beyond a reasonable doubt. Again, because we cannot know with assurance “[t]he precise point which prompts the [death] penalty in the mind of any one juror” (People v. Hines, supra, 61 Cal.2d at p. 169), the error must be considered prejudicial in this regard.
Accordingly, we conclude that the trial court’s failure to give a reasonable doubt instruction with respect to other crimes requires the reversal of the judgment as to penalty and a remand for a new penalty trial.[21] *58 invalidated an Ohio death penalty statute which had strictly limited the mitigating factors the sentencing authority could take into account in deciding whether to impose the death penalty, concluding that under the Eighth Amendment the sentencing authority may “not be precluded from considering, as a mitigating factor, any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” (Original italics.) (Id., at p. 604 [57 L.Ed.2d at p. 990] (plurality opn. of Burger, C. J.).) Earlier this year, a majority of the Supreme Court explicitly reaffirmed the Lockett holding, reversing a death penalty imposed upon a 16-year-old on the ground that the sentencing judge had not fully considered all the potentially mitigating circumstances present in that case. (See Eddings v. Oklahoma (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869].)
*56 B. Other Penalty Issues
Because the instructional error just discussed necessitates a retrial of the penalty phase, we need not address most of defendant’s additional claims of penalty phase error. We believe, however, that two of the issues warrant discussion in order to avoid error at the retrial.
B.l. Prosecutorial Argument on Jury Consideration of Sympathy
In his penalty phase argument, the prosecutor repeatedly told the jurors that it would be improper for them to consider defendant’s “family history” or to permit their sympathy for him to affect their penalty determination. At a number of points, he stated that under the governing death penalty statute the jury could properly take into account only “two factors”—the circumstances of the crime and “the person Andrew Robertson was at the time the crime was committed”—and that other “sympathy factors”—such as the fact that “he didn’t get the breaks in life”—were irrelevant and should not play a role in the jury’s penalty decision.[22]
 We agree with defendant’s claim that these comments were erroneous and misleading and should not be repeated at the retrial.
*57 The Attorney General acknowledges that in a consistent line of cases stretching back more than two decades this court had held that in the penalty phase of a capital trial the jury may properly consider sympathy or pity for the defendant in determining whether to show mercy and spare the defendant from execution, and that it is error to advise the jury to the contrary. (See, e.g., People v. Vaughn (1969) 71 Cal.2d 406, 422 [78 Cal.Rptr. 186, 455 P.2d 122]; People v. Polk, supra, 63 Cal.2d 443, 451; People v. Friend (1957) 47 Cal.2d 749, 765-768 [306 P.2d 463].) He initially argues, however, that this line of California authority is no longer valid in the modern death penalty era ushered in by the United States Supreme Court decisions in Furman v. Georgia (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] and Gregg v. Georgia (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and their offspring. He submits that jury consideration of sympathy for the defendant is inconsistent with the “guided discretion” mandated by Furman and Gregg and asserts that under those decisions the jury at the penalty phase may only consider the specific factual mitigating circumstances enumerated in the governing death penalty statute. '
Recent Supreme Court decisions clearly refute that submission. In Lockett v. Ohio (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], the lead opinion
*58 Lockett and Eddings make it clear that in a capital case the defendant is constitutionally entitled to have the sentencing body consider any “sympathy factor” raised by the evidence before it. As the plurality opinion in Woodson v. North Carolina (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978], emphasized: “A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration infixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. . . . [I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment [citation] requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.’’'’ (Italics added.) Thus, as we explained in our recent opinion in People v. Haskett, supra, 30 Cal.3d at page 863: “It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant’s background against those that may offend the conscience.”
The Attorney General alternatively argues that the prosecutor’s remarks should not be interpreted as advising the jury that it could not consider sympathy at all, but rather that it should not base its decision on “factually untethered sympathy,” i.e., sympathy not related to any facts revealed by the evidence. Although some of the prosecutor’s remarks are susceptible to this interpretation, the prosecutor did not limit his argument to factually unsupported sympathy, but repeatedly told the jury that it should not consider defendant’s family background, his military career and other possibly favorable matters as to which evidence was presented, because those “sympathy factors” did not relate to the crimes themselves or—assertedly—to the person defendant was at the time he committed the crimes. (See fn. 22, ante.) Under these circumstances, the prosecutor’s line of argument was seriously misleading, for it *59 erroneously foreclosed the jury from considering potentially mitigating factors which may have persuaded one or more jurors that life imprisonment without possibility of parole, rather than death, was the appropriate punishment. As noted, the United States Supreme Court has held that any such restriction on a sentencing body’s consideration of mitigating factors is unconstitutional. (See, e.g., Lockett, supra, 438 U.S. 586; Eddings, supra, 455 U.S. 104.) Accordingly, the argument should not be repeated at the retrial.
B.2. Instruction on “Mental Defect”
In advising the jury of the various aggravating and mitigating circumstances which it should consider in determining penalty, the trial court, quoting former section 190.3 subdivision (g), instructed the jury that one of the circumstances it should take into account if relevant was “[wjhether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the effects of intoxication.” (Italics added.)
Defendant points out that ALI Model Penal Code has a similar mitigating circumstance provision on which former section 190.3, subdivision (g) was apparently modeled, but the Model Penal Code provision allows mitigation for impairment “as a result of mental disease or defect or intoxication. ” (Italics added.) (ALI, Model Pen. Code, § 210.6, subd. (4)(g), cited with approval in Gregg v. Georgia, supra, 428 U.S. 153, 194, fn. 44 [49 L.Ed.2d 859, 886].) Defendant suggests that because former section 190.3, subdivision (g) omitted “mental defect”—as contrasted with “mental disease”—as an expressly enumerated factor, an instruction which tracks the statute could be interpreted as barring consideration of defendant’s alleged mild mental retardation, a condition that would generally be viewed as a “mental defect” rather than a “mental disease.”
We are unaware of any explanation for the omission of “mental defect” from former section 190.3 subdivision (g).[23] It appears most unlikely that the Legislature actually intended to distinguish between impairments resulting from “mental disease” and impairments resulting from “mental defect,” permitting the former but not the latter to be considered in mitigation in a death penalty case. As we stated in a related context in In re Ramon M. (1978) 22 Cal.3d 419, 426 [149 Cal.Rptr. 387, 584 P.2d 524], such a distinction would be “difficult to justify. ...” In any event, we think that defendant is plainly correct in suggesting that under Lockett and Eddings the state may not constitutionally prevent a sentencing authority from considering evidence in mitigation which pertains to a defendant’s mental defect. (See also Bell v. Ohio (1978) 438 *60 U.S. 637 [57 L.Ed.2d 1010, 98 S.Ct. 2977].) Accordingly, at the penalty retrial the jury should be clearly informed that it may consider any impairment of the defendant resulting from a “mental defect” as well as a “mental disease.”
The judgment is reversed as to penalty, and affirmed in all other respects. The order to show cause is discharged and the writ of habeas corpus is denied.
Bird, C. J., and Newman, J., concurred.

Except as otherwise indicated, all statutory references are to the Penal Code.

Defendant had sharpened his knife between the Litzau and Gloe homicides.

Kim P. reported the incident to the police and defendant was ultimately arrested and pleaded guilty to a violation of Penal Code section 288a—oral copulation. At trial, defendant admitted the oral copulation conviction as a charged prior offense. Despite defendant’s admission, the trial court—after hearing Kim P.’s testimony on voir dire—admitted her testimony as probative of defendant’s state of mind at the time of the killings. On this appeal, defendant does not challenge the general admissibility of Kim P.’s evidence.

The jury found true the first (multiple first degree murders), fourth through ninth (both murders were wilful, premeditated and deliberate and involved torture and were committed during the commission or attempted commission of robbery and kidnap), eleventh (wilful, deliberate and premeditated murder of Litzau committed during the attempted commission of rape) and twelfth (wilful, deliberate and premeditated murder of Gloe committed during commission of rape) special circumstances. The only special circumstances found not true were alternative allegations, covering possible findings of second degree murder and rape or attempted rape with respect to the two victims.

As discussed below, defendant does challenge several of the special circumstance findings on the ground that there was insufficient evidence of premeditation or deliberation. (See part III, C, post.) He concedes, however, that the evidence was sufficient to support the first degree murder convictions on a felony-murder theory.

The instruction in question read in full: “In your deliberations the subject of penalty or punishment is not to be discussed or considered by you. This is a matter which must not in any way affect your verdict or affect your finding as to the special circumstance[s] charged in this case. ”

The trial court informed the jury that it would send all of the instructions into the jury room for its use during deliberations. The record does not reveal whether or not this instruction—which is included in the clerk’s transcript as an instruction given to the juiy—was in fact provided to the jury.

These claims are based in part on evidence revealed during reference proceedings ordered by this court. (See pp. 38-39, post.)

The evidence on this point was conflicting, with the police officer testifying that defendant had initiated the conversation after the unsuccessful attempt to reach McEuen, and defendant testifying that the officer had reopened the questioning by asking him whether he wanted to talk. The Attorney General asks us to reject the referee’s resolution of this conflict, but the referee’s conclusion is supported by substantial evidence and, in view of his opportunity to observe the demeanor of the witnesses, we accept his finding on this point. (See, e.g., In re Branch (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174].)

 "Because of a conflict in declarations with respect to Levin’s actions, we referred the matter to a referee for an evidentiary hearing. The referee concluded that—contrary to trial counsel’s testimony at the evidentiary hearing—Levin had not told counsel that he had personally interviewed defendant, but had only indicated that his initial opinion that defendant was not insane was a preliminary conclusion based on the reports of other doctors which had been forwarded to him by counsel.
Although the Attorney General again suggests that we reject the referee’s findings and find that trial counsel reasonably, albeit mistakenly, assumed that Levin had personally interviewed defendant, we believe the evidence reasonably supports the referee’s findings. Nonetheless, as we explain, trial counsel’s error in this regard does not warrant reversal.

Defendant also contends that trial counsel was ineffective in cross-examining several of the prosecution’s psychiatrists “eliciting] evidence more damaging to [defendant] than the prosecutor was able to accomplish on direct.” In his declaration, however, trial counsel explains his approach as a matter of trial strategy: “Dr. Flanagan, a psychiatrist who had examined the defendant in a previous felony case, was so prejudicial against the defendant that the only trial tactic which could be used was to bring this animosity to the surface as viciously and violently as possible, and to impress the jury that Dr. Flanagan, Dr. Gericke, Dr. Larkin and counselor McEuen were all vehemently against the defendant and that their personal, subjective feelings had overcome their ability to consider the defendant in an objective way.” In general, our court has been reluctant to second-guess counsel on such choice of tactics (cf. e.g., People v. Jackson (1980) 28 Cal.3d 264,291 [168 Cal.Rptr. 603, 618 P.2d 149]) and on these facts we cannot conclude that trial counsel was ineffective in this respect.
In addition, defendant contends that the trial transcript shows that trial counsel failed to review one of the prosecution psychiatrist’s reports before the psychiatrist’s testimony at trial. Counsel’s declaration explains, however, that he did review the report and that the portion of the transcript to which defendant refers simply reflects his momentary confusion on the subject. The record supports counsel’s explanation and such a minor slip clearly does not rise to the level of inadequate assistance. (See People v. Haskett (1982) 30 Cal.3d 841, 853 [180 Cal.Rptr. 640, 640 P.2d 776].)

The challenged statement was as follows: “The fact that Mr. Robertson is mean, Ladies and Gentlemen, the fact that he does mean, horrible acts does not mean that he’s suffering from diminished capacity. It does not mean that he has to go to a mental hospital. We have alternative courses for mean people.”
As the Attorney General points out, the prosecutor made this statement in the course of comparing the findings of Drs. Gericke and Flanagan in their examinations of defendant after the rape of Kim P. with these same doctors’ findings after the killings in the present case. After the Kim P. incident, Gericke and Flanagan found that although defendant was dangerous he was not suffering from any mental illness that would warrant treatment in a mental hospital as an MDSO. In this case defense counsel—in support of the diminished capacity defense—had presented testimony of defendant’s former defense counsel to the effect that he believed defendant was an MDSO. In this context, the prosecutor’s comment may well have been an attempt to reiterate the psychiatrists’ finding that—as in the Kim P. incident—defendant was not suffering from any mental impairment that would support a diminished capacity defense.

Section 190.6 reads in full: “The Legislature finds that the imposition of sentence in all capital cases should be expeditiously carried out. [f] Therefore, in all cases in which a sentence *47 of death has been imposed, the appeal to the State Supreme Court must be decided and an opinion reaching the merits must be filed within 150 days of certification of the entire record by the sentencing court. In any case in which this time requirement is not met, the Chief Justice of the Supreme Court shall state on the record the extraordinary and compelling circumstances causing the delay and the facts supporting these circumstances. A failure to comply with the time requirements of this section shall not be grounds for precluding the ultimate imposition of the death penalty.”

Under the 1977 law, the “felony murder” special circumstances—i.e., murder during the commission or attempted commission of robbery, rape, kidnaping, etc.—and the “torture” special circumstance, required a finding that the murder was willful, deliberate and premeditated. No such finding was required for the multiple murder special circumstance. (Former § 190.2, subd. (c)(5).)

With respect to Litzau’s death, the transcript of defendant’s confession reveals the following dialogue: “[Defendant:] She was moaning and groaning and I stabbed her in the heart a couple of times and I know I stopped for a second. [1] [Police:] Why did you stop? [f] [Defendant:] I thought she was dead, at first, but then I kept hearing her gasp for air. I knew she wasn’t dead, so I started stabbing her again. I cut her throat. . . .”
With respect to Gloe’s death, defendant stated: “Well, at first I just started stabbing just over and then I—After I stabbed her a bunch of times and I thought she was dead, Preached up and went over here and she was still breathing and I cut her throat.”

In addition to the Anderson point, defendant suggests that in light of the evidence indicating that defendant may be mildly mentally retarded, we should find the evidence insufficient to show premeditation or deliberation by analogy to People v. Goedecke (1967) 65 Cal.2d 850, 857-858 [56 Cal.Rptr. 625, 423 P.2d 111, 22 A.L.R.3d 1213]; People v. Nicolaus (1967) 65 Cal.2d 866, 878 [56 Cal.Rptr. 635, 423 P.2d 787] and People v. Bassett (1968) 69 Cal.2d 122, 137-148 [70 Cal.Rptr. 193, 443 P.2d 777]. Unlike the cited cases, however, in this case the evidence of defendant’s alleged mental defect was vigorously contested, and the jury could reasonably have found that defendant did not suffer from a mental impairment that negated premeditation or deliberation.

For example, at one point in the interrogation on the Litzau murder, the following exchange occurred: “[Defendant:] And I stabbed her and I know after stabbing her a bunch of times she was still alive. She was still alive. So, I spraddled [sic] her legs and took the knife and stabbed her in the vagina, and all that. [K] [Police:] She was still alive when you did that? [1] [Defendant:] Yeah. And she let out a yell. Then from there I went up to the heart area.”

Former section 190.4, subdivision (d), which provides that “[i]n any case in which the defendant may be subjected to the death penalty, evidence presented at any prior phase of the trial . . . shall be considered at any subsequent phase ... if the trier of fact of the prior phase is the same trier of fact at the subsequent phase,” is obviously intended simply to eliminate any need for the reintroduction of evidence which has already been presented to the trier of fact. Quite plainly, the section does not address the specific question with which the Polk-Stanworth line of cases is concerned, namely, the standard of proof—reasonable doubt or preponderance of the evidence—that should guide the jury’s consideration of a special class of evidence—evidence of other crimes. The People have failed to point to anything in the legislative history which suggests that this provision was intended to abrogate the Polk-Stanworth line of cases.

In order to avoid potential confusion over which “other crimes’’—if any—the prosecution is relying on as aggravating circumstances in a given case, the prosecution should request an instruction enumerating the particular other crimes which the jury may consider as aggravating circumstances in determining penalty. The reasonable doubt instruction required by the PolkStanworth line of cases can then be directly addressed to these designated other crimes, and the jury should be instructed not to consider any additional other crimes in fixing the penalty. Without such a limiting instruction, there is no assurance that the jury will confine its consideration of other crimes to the crimes that the prosecution had in mind, because—as already noted—the jury is instructed at the penalty phase that in arriving at its penalty determination it may generally consider evidence admitted at all phases of the trial proceedings. (See former § 190.4, subd. (d).)

In his argument, the prosecutor told the jury that the testimony showed that defendant “did, in fact, rape a person and he used force and violence upon that person. ” The prosecutor was apparently using the term “rape’’ in a nonlegal, generic sense to refer generally to any forcible sexual offense, but the jury was not specifically so informed.

Defendant argues that if, as we have found, reversible error occurred at the penalty phase, the court should simply impose a sentence of life without possibility of parole and should not remand for a new penalty trial. He bases this contention on former section 190.4, subdivision (b), *56 which provided that if the jury was unable to agree on a verdict at the penalty phase, the trial court must impose a sentence of life without possibility of parole rather than hold a new penalty trial. Defendant asserts that the penalty phase error deprived him of the benefits of that provision, and that a remand for a new penalty hearing would likewise violate the section.
The argument is specious. A remand for a new penalty hearing will in no way deprive defendant of the benefits of the “hung jury” provision of former section 190.4, subdivision (b). If the jurors deadlock at the new penalty phase hearing, he will enjoy the full benefits of that section. Defendant points to no authority which supports his contention; on the contrary, all of the cases which have found penalty phase errors in trials conducted under the 1977 law have uniformly remanded for new penalty trials. (See, e.g., People v. Haskett, supra, 30 Cal.3d 841, 861; People v. Lanphear (1980) 26 Cal.3d 814, 844 [163 Cal.Rptr. 601, 608 P.2d 689]; cf. People v. Quicke, supra, 71 Cal.2d 502, 524; People v. Henderson (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677].)

The prosecutor’s remarks are too extensive to quote in full, but the gist of the comments are reflected in the following passages:
“What do you consider in making [the penalty] decision in this case? Well, . . . it’s easier to say what you should not consider in making your decision. . . . Irrelevant information. Well, there is much of it given to you in all statements of the trial. . . . Irrelevant information is interesting information, maybe informative information, but it is not information that goes to the issue involved. [H] An example would be the family history of Andrew Robertson. All murderers are human beings. Do not expect a murderer to be a monster. All murderers have mothers. It is reasonable to assume that all murderers at sometime showed that they liked their mothers. . . . All murderers, it is reasonable to assume, are not too intelligent, by the simple act of doing a murder. ...[([] Since all of those things are a part of every murderer . . . [t]he fact that they have all of these things will not help you in deciding where this particular case falls on this spectrum.
“Secondly, irrelevant information in this case would be a prejudice or a passion or sympathy. This is where you will have a great deal of difficulty. . . . You are responsible for listening to the facts of this case. Ignore your own personal opinions of sympathy and prejudice and passion. It’s necessary for you to do that to base it upon the facts, to have a reason for what you’re doing, and to ignore sympathy, because sympathy is unreasoned. [([] If you use sympathy, no standard can ever be set. What you’re doing here, you’re going to be setting a standard. You’re going to *57 say that this crime or crimes that Andrew Robertson did, if another person does that, they can expect a certain penalty if they do that type of crime. If you base your decision, however, on your sympathy or passion, then it leaves the law open to that argument: Well, even though the facts are against me, I can still find a jury that I can arouse their sympathy or passion and, for that reason, I can have them ignore the facts and get the lesser offense.
“Again, I will emphasize very strongly that these factors are based upon facts, the testimony. Not sympathy, not Dr. Hunt’s: He should get off because he didn’t get the breaks in life. . . . That’s a sympathy factor, a sympathy factor that does not focus on the real issue, the crime and person Andrew Robertson was at the time was committed, ffl] Those are the two factors. That’s what all of these circumstances go to: The person at the time the crime is committed and the crime itself. <(
“I will again re-emphasize that in this case you are judges and as judges you must make your decision based upon the facts, the evidence, not upon sympathy, not upon hearsay information: . . . [Defense counsel] has pointed out certain things in his argument. I would submit to you that this is not or those are not things that you will consider in making your opinion in this case. It is not evidence. [H] He, first of all, went to the person of Andrew Robertson, giving Andrew Robertson’s history, where he was born, how old he was, what he did as a young man, the fact that he went into the service. That is not a factor. That is irrelevant to your decision in this case. You must decide whether or not this crime is of the death penalty type and you must consider the actor in that crime, Andrew Robertson, as he appeared during the course of the crime, not as he appeared when he was four years old or nine years old. . . . [f] The reason for that is that you are going to focus on the crime itself, what penalty is going to be invoked for this type of crime. m.. •
“The fact that Andrew Robertson was in Vietnam again is this a sympathy ploy? The fact that he went to Vietnam? Many of us went to Vietnam. Many of us were in the Army. This does not justify any of us going out and torturing somebody to death. This is simply a sympathy ploy. It is going outside the evidence and asking you to have sympathy, compassion. You must be bound by the evidence even though it’s very difficult, but all of you agreed as judges in this case . . . that you would take that responsibility and handle it properly.”

The comparable provision of the current death penalty statute, section 190.3, subdivision (h), refers to “mental disease or defect, or the effects of intoxication.”