Filed 7/24/13  P. v. Guzman CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>ALEXIS GUZMAN et al.,<br><br>   Defendants and Appellants. | 2d Crim. No. B232497<br>(Super. Ct. No. 1312678)<br>(Santa Barbara County) |

Alexis Guzman (Alexis) and Dennis Garcia Guzman (Dennis)[1] appeal their convictions for first-degree murder (Penal Code, §§ 189/187).[2] They argue that the trial court committed several instructional errors, and Alexis contends that his trial counsel was constitutionally ineffective.  We reject these challenges, and affirm the prison sentences of 50 years to life for each defendant.

*FACTS AND PROCEDURAL HISTORY*

I. *The Crime*

Hector Perez (Perez) was fatally shot in an alleyway in Santa Maria, California.

---

[1] For the sake of clarity, we use their first names.

[2] All statutory references are to the Penal Code unless otherwise specified.

Minutes before the shooting, Alexis saw Perez in the alleyway. The two got into a verbal argument over the volume of Perez's car stereo. Alexis was a member of the West Park street gang, and the alley was claimed as West Park gang territory.

When the argument was not resolved to Alexis's satisfaction, he sent off a flurry of text messages. He told one gang member, Javier Mendez, to bring him a knife. When Mendez could not, Alexis sent him a message stating: "Come by fool we going to do something right now." At the same time, Alexis told Dennis—his brother and also a West Park gang member—that a member of a rival gang was in the alley, even though Perez was not a gang member. Alexis also informed his girlfriend that he was "about to beat some fool right now." Dennis did not rush to Alexis's aid; instead, he took the time to borrow a gun from another gang member before coming to the alley. Within minutes, the alley was full of West Park gang members and friends Perez had summoned.

A fist fight ensued. Eyewitness accounts of the fight differed, but a few facts were undisputed: Perez was unarmed. Perez did not throw the first punch. And the fight ended when Perez was shot twice at point black range. Eyewitness accounts of the shooter's identity also varied; the gunman was identified as Dennis, as Alexis, or as an unknown third person. However, Dennis had the gun immediately after the shooting, and bragged to others that he had shot Perez.

## II. *Prosecution*

The People charged both Dennis and Alexis with first-degree murder (§§ 189/187). The People further alleged that the murder was "for the benefit of, at the direction of, or in association with [a] criminal street gang" (§ 186.22, subd. (b)), and that a principal "personally and intentionally discharge[ed] a firearm . . . proximately caus[ing] great bodily injury . . . or death" (§ 12022.53, subd. (d), (e)(1)). The People further alleged that Dennis personally used a firearm (§ 12022.5, subd. (a)).

2

The jury found both defendants guilty of first-degree murder, and found true the gang enhancement and the enhancement for a principal's discharge of a firearm causing great bodily injury. The jury did not reach a verdict regarding Dennis's personal use of a firearm. The court sentenced each defendant to 50 years to life in state prision—25 years to life on the murder charge, plus a consecutive 25 year-to-life sentence on the discharged firearm enhancement.

*DISCUSSION*

## I. *Instructional Errors*

The court instructed the jury that Dennis or Alexis could be guilty of first-degree murder if either defendant (1) personally perpetrated the crime of first-degree murder; (2) aided and abetted the other in perpetrating first-degree murder; (3) aided and abetted the other in committing the predicate offenses of assault, battery, assault with force likely to cause great bodily injury, or assault with a deadly weapon if "murder" was a "natural and probable consequence" of one of those predicate offenses ("natural and probable consequences theory"); or (4) conspired with others to commit any of the four predicate offenses if murder furthered the conspiracy and was a natural and probable consequence of the conspiracy's common design ("conspiracy theory"). Dennis and Alexis argue that one or more of these theories is legally defective, and that this defect requires their murder convictions to be vacated.

## A. *Defenses*

Dennis and Alexis first contend that the trial court erred (1) in denying Dennis's request to instruct the jury on the defenses of perfect and imperfect self-defense to the murder charge; and (2) in not instructing the jury sua sponte on the defenses of self-defense and defense of others as to the four predicate offenses underlying the natural and probable consequences and conspiracy theories. The trial court's duty to give these instructions turns on whether the evidence presented was "substantial enough to merit consideration by the jury . . . ." (*People*

3

*v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)[3]  "Substantial evidence" means what it says; "'any evidence, no matter how weak,'" will not suffice.  (*People v. Whalen* (2013) 56 Cal.4th 1, 68, quoting *People v. DePriest* (2007) 42 Cal.4th 1, 50.)  We independently review the trial court's evaluation of the evidence, and in so doing, may not evaluate the credibility of witnesses and must recognize that a single witness's testimony can constitute "substantial evidence."  (*Manriquez*, *supra*, at p. 581; *People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

       1.  *Defenses to murder charge*

There are two species of self-defense under California law—namely, "perfect" self-defense and "imperfect" self-defense.  (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1198-1199).)  Both defenses require that the defendant *actually* believe that he or she was in "imminent danger of death or great bodily injury . . . ."  (*Randle*, *supra*, at p. 994; *In re Christian S.* (1994) 7 Cal.4th 768, 783 (*Christian S.*) ["Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice"].)  If that belief is reasonable "'from the point of view of a reasonable person in the [defendant's] position,'" the defendant has acted in perfect self-defense and the homicide is justified and not a crime at all. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1083, quoting *People v. McGee* (1947) 31 Cal.2d 229, 238; § 197, subd. (1); *People v. Flannel* (1979) 25 Cal.3d 668, 674-675, superseded on other grounds by § 25, subd. (a); *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49-50.)  If that belief is not objectively reasonable, it still negates the "malice" element of murder, and the defendant is accordingly guilty at most of the lesser-included offense of voluntary manslaughter.  (*Christian S.*,

---

[3] For true defenses (such as a perfect self-defense and defense of others), the trial court's duty also turns on the extent to which the defense is consistent or inconsistent with the defendant's theory of the case.  (*People v. Booker* (2011) 51 Cal.4th 141, 179.)

*supra*, at p. 773.)  This "imperfect" self-defense is accordingly not a true defense, but rather an instruction on a lesser-included offense.  (*Manriquez*, *supra*, 37 Cal.4th at p. 581.)

However, a defendant may not assert either type of self-defense if he was wholly or partly responsible for creating the circumstances that precipitated his use of deadly force.  Thus, a defendant who "'seeks or induces the quarrel which leads to the necessity for killing his adversary'" may not claim self-defense unless he "'honestly endeavor[s] to escape'" from the fight he started (*People v. Hill* (2005) 131 Cal.App.4th 1089, 1102-1103 (*Hill*), overruled on other grounds in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5; *People v. Holt* (1944) 25 Cal.2d 59, 66 (*Holt*); *Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1), or unless such escape is impossible because his adversary launches a "sudden and deadly counter assault." (*People v. Sawyer* (1967) 256 Cal.App.2d 66, 75; *People v. Quach* (2004) 116 Cal.App.4th 294, 302; accord, *Holt*, *supra*, at p. 66 ["'A man has not . . . the right to provoke a quarrel and take advantage of it, then justify the homicide' . . ."].)  A defendant is also precluded from asserting self-defense if he and the victim mutually agreed to engage in combat "before the claimed occasion for self-defense arose." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1047.)

The trial court did not err in declining to give either self-defense instruction to the murder charge for two reasons.  First, the undisputed evidence foreclosed both types of self-defense as a matter of law.  (E.g., *People v. Watie* (2002) 100 Cal.App.4th 866, 877-879 [no instruction required if evidence precludes self-defense instruction as a matter of law].)  The defendants each sought and induced the quarrel that led to Perez's shooting:  Alexis told Dennis to come to the alley and "sweetened" the incentive by falsely reporting that a rival gang member was there, and Dennis borrowed a gun and went to the alley.  Dennis, Alexis, or another gang member threw the first punch.  Moreover, Dennis or Alexis never attempted to withdraw from the fight they prompted, and the unarmed Perez never

5

launched a "sudden and deadly counter assault." At a minimum, Dennis, Alexis and Perez agreed to engage in mutual combat because Perez and Alexis summoned back-up and Dennis showed up ready to fight.

Second, substantial evidence does not support a finding that either defendant actually feared imminent great bodily injury or death. Alexis did not walk away from his verbal quarrel with Perez; instead, he spent several minutes sending text messages in order to summon Mendez, Dennis and others; trying to acquire a knife; and bragging to his girlfriend that he was about to "beat some fool." This evidence precludes any argument that Alexis was actually in imminent fear.

The same can be said of Dennis. Upon learning that a rival gang member was in the alley, Dennis did not immediately come to his brother's aid; instead, he took the time to get a gun. This does not reflect imminent fear. Dennis contends that he borrowed the gun only for defensive use because gang members need to protect one another and because he might have heard that Perez had previously assaulted someone else with a knife. We are not persuaded. A similar argument was rejected in *Hill*, which affirmed the denial of a self-defense instruction when the defendant took the time to get a weapon before confronting the victim. (*Hill*, *supra*, 131 Cal.App.4th at pp. 1102-1103.) Moreover, if protecting one's fellow gang members was enough by itself to place a defendant in imminent fear, self-defense instructions would be categorically required in every gang violence case, but that is not the law. Dennis's further argument that he obtained a gun because of Perez's prior knife fight with someone else is also without merit: Dennis did not know *Perez* was in the alley until after he borrowed the gun, and Perez was weaponless when he and Dennis started their fist fight. Although Dennis was not required to testify to his own fear (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262), "'there must be evidence from which a jury could find'" that he labored under an actual fear that deadly force was immediately necessary for protection (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 82). Here there was none.

6

2. *Defenses to predicate offenses*

Self-defense and defense of others can also be defenses to the crimes of assault (whether simple assault, assault with a deadly weapon, or assault with force likely to cause great bodily injury) and battery. (§§ 692, 694.) Alexis contends that the trial court erred in not instructing the jury sua sponte on these defenses as to the four uncharged predicate offenses underlying the natural and probable consequences and conspiracy theories. More specifically, Alexis argues that he jumped into the fight against Perez in defense of Dennis and that the absence of self-defense and defense-of-others instructions precluded the jury from finding him not liable under two of the four theories underlying the murder charge.

We need not decide whether substantial evidence supports the giving of these instructions because Alexis was not prejudiced by their absence. At trial, the prosecutor argued that Alexis was liable under the natural and probable consequences and conspiracy theories for sending text messages summoning other West Park gang members. Alexis's attorney argued that the text messages never mentioned a fight, and that once the fight broke out, Alexis was an innocent bystander who "simply stood there." No one argued that Alexis had jumped into the fight. (E.g., *People v. Prettyman* (1996) 14 Cal.4th 248, 273 [effect of instructional error gauged in part by reference to counsel's arguments].) On this record, self-defense and defense-of-others instructions are irrelevant because Alexis's liability for the murder under the natural and probable consequences and conspiracy theories for sending inflammatory text messages would have already attached by the time he jumped into the fight and consequently would not have been negated by instructions relevant solely to his involvement in the fight.

B. *Object of natural and probable consequences*

Dennis and Alexis also argue that the trial court erred when it instructed the jury that each could be liable for first-degree murder under the natural and probable consequences theory if, among other things, "the commission of *murder* was a natural probable consequence" of any of the four predicate offenses.

7

Relying on *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*), the defendants contend that the jury should have been required to find that the natural and probable consequence of the predicate offenses was *first-degree murder* rather than merely "murder." The People respond that *Woods* was wrongly decided. *Woods's* continuing validity is currently before our Supreme Court. (See *People v. Chiu*, reviewed granted Aug. 2012, S202724, [C063913; nonpublished opinion; Sacramento County Superior Court; 03F08566].) However, we need not take up the issue of *Woods's* validity because the trial court committed no error even if *Woods* remains good law.

*Woods* held that a trial court erred when it informed the jury that a defendant who aids and abets a predicate offense for which murder is a foreseeable consequence must be liable for the same degree of murder as the perpetrator of the murder. (*Woods*, *supra*, 8 Cal.App.4th at pp. 1580-1592.) The *Woods* court reasoned that a jury must be instructed to find that a particular *degree* of murder was a natural and probable consequence of one or more predicate offenses "where the facts would support a determination that the greater crime [first-degree murder] was not a reasonably foreseeable consequence but the lesser offense [second-degree murder] was such a consequence." (*Id.* at p. 1588.)

However, the evidence in this case does not support a finding that first-degree murder was not a reasonably foreseeable consequence of the four predicate offenses, but that second-degree murder was such a consequence. The sole theory for first-degree murder in this case was that the shooter acted "willfully, deliberately, and with premeditation." Accordingly, the question presented is whether the evidence would support a finding that it was reasonably foreseeable from the gang-related assaults or battery against Perez that he would be intentionally shot, but not reasonably foreseeable that he would be shot willfully, deliberately and with premeditation. The answer is, "No." Alexis summoned fellow gang members, tried to obtain a weapon, and did so as part of his plan to "beat some fool." Dennis responded to Alexis's summons by obtaining a gun and

8

starting a fist fight with Perez.  Dennis argues that the jury did not unanimously agree that he was the shooter and asserts that he acted in self-defense.  Regardless whether Dennis, Alexis or another West Park member pulled the trigger, the evidence indicated that the shooter waited until the fist fight was well under way before firing the gun not once, but two or three times.  No evidence suggested that the shooting was anything other than the anticipated culmination of the escalating confrontation engineered by West Park gang members, and hence willful, deliberate and premeditated.  Further, self-defense was inapplicable for the reasons discussed above.  There was no error under *Woods.*

C. *Second-degree murder "cap" on natural and probable consequences liability*

Alexis argues that an aider and abettor can be liable, at most, for second-degree murder as the natural and probable consequence of any predicate offense.  In particular, he contends that (1) section 189 enumerates the permissible types of first-degree murder and does not list murders that are the natural and probable consequence of other offenses a person aids and abets; and (2) it is unfair, as a policy matter, to hold a person who merely aided and abetted a predicate offense liable for a first-degree murder that he did not subjectively intend or contemplate.

We reject both arguments.  Alexis's first argument confuses the *types* of first-degree murder with the *theory of liability* by which they may be committed. Courts may not add to the statutorily enumerated list of conduct qualifying as first-degree murder.  (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 815, 827 ["courts may not add provisions to a statute"].)  But California law elsewhere provides that aiders and abettors are liable as principals (§ 31; see also § 971), and "stand[] on equal footing" with the perpetrators (*People v. McPherson* (2001) 86 Cal.App.4th 527, 532).  Thus, holding aiders and abettors liable for first-degree murder does not amend section 189.  The propriety of this conclusion is confirmed by the plethora of decisions affirming first-degree murder convictions resting on a natural and probable consequences theory.  (E.g., *People v. Williams* (1997) 16 Cal.4th 635,

9

676, fn. 14; *People v. Sandoval* (2007) 41 Cal.4th 825, 841; *People v. Garcia* (2008) 168 Cal.App.4th 261, 272-274.)

Alexis's second argument fares no better. A person who aids and abets a predicate offense that foreseeably results in further crimes need not have intended to encourage or facilitate the particular crimes later committed by the perpetrator. (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5.) And this result is not an outlier. A co-participant in a joint criminal endeavor—whether he is coconspirator, an aider and abettor, or a joint felon—has long been held vicariously liable for his co-participants' foreseeable crimes even though he has a different (and ostensibly lesser) degree of moral culpability. (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026 [coconspirator liability]; *People v. Gonzales & Soliz* (2011) 52 Cal.4th 254, 296 [aider and abettor liability]; *People v. Cavitt* (2004) 33 Cal.4th 187, 196 [felony murder liability]; see generally *People v. Luparello* (1986) 187 Cal.App.3d 410, 437 ["The law . . . implicitly recognizes the greater threat of criminal agency and explicitly seeks to deter criminal combination by recognizing the act of one as the act of all"].) The courts are, in any event, without authority to rewrite the law of homicide for policy reasons.

## II. *Ineffective Assistance of Counsel*

Alexis argues that he is entitled to a new trial because his trial counsel was constitutionally ineffective. He contends that his counsel did not object to Dennis's attorney's questions on cross-examination that elicited (1) testimony from two different witnesses regarding a rumor that Alexis was the shooter; and (2) testimony from another witness who mentioned a newspaper article naming Alexis as the shooter. Alexis asserts that his counsel could have had no strategic reason not to object to this testimony on hearsay grounds, and that its admission prejudiced by him by allowing the jury to hear additional evidence that he was the shooter.

To prevail on his claims of ineffective assistance of counsel, Alexis must establish that (1) his counsel's performance was "deficient"; and (2) there is a

10

"reasonable probability" that, but for that deficient performance, "the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*).) Counsel is "strongly presumed to have rendered adequate assistance." (*Id.* at p. 690.) For these reasons, "[a] mere failure to object to evidence or argument seldom establishes counsel's incompetence. [Citations.]" (*People v. Frierson* (1991) 53 Cal.3d 736, 747.)

Counsel's decision not to object on hearsay grounds to the witness's reference to a newspaper article mentioning Alexis as the shooter did not constitute deficient performance because that evidence was not hearsay. (*People v. Jones* (1998) 17 Cal.4th 279, 309 [failure to make meritless objection does not amount to ineffectiveness].) Out-of-court statements are hearsay only if "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The witness who mentioned the article testified that he came forward to identify *Dennis* as the shooter because the article's report to the contrary was incorrect. Because the article was mentioned for its falsity and not its truth, a hearsay objection would have been overruled.

We need not address whether the absence of any objection to the rumor that Alexis was the shooter constituted deficient performance because its admission did not create a "reasonable probability" that the jury would have reached a different result for two reasons. (*Strickland*, *supra*, 466 U.S. at p. 697 [court may decide prejudice issue first].) First, the rumor was brought up during the cross-examination of the witness who affirmatively testified that he saw Alexis shoot Perez. The rumor was therefore cumulative of direct eyewitness testimony. The cumulative nature of this testimony distinguishes it from the cases Alexis cites. (See *People v. Robertson* (1982) 33 Cal.3d 21, 41-42 [no objection to inadmissible evidence that defendant committed other, uncharged murders; admission of evidence prejudicial]; *People v. Guizar* (1986) 180 Cal.App.3d 487, 491-492 [same]; *People v. Moreno* (1987) 188 Cal.App.3d 1179, 1190-1191 [no objection to sole, inadmissible evidence of *corpus delecti*; admission of evidence prejudicial].)

11

Second, this cumulative evidence did not likely affect the verdict because, as noted above, no one argued that Alexis should be found guilty for Perez's murder as the shooter.  Instead, Alexis's liability to the murder was tethered exclusively to his role in summoning other gang members to the fight.

*DISPOSITION*

The judgments are affirmed.

NOT TO BE PUBLISHED.

HOFFSTADT, J.[*]

We concur:

YEGAN, A. P. J.

PERREN, J.

---

* (Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to art. 6, § 6 of the Cal. Const.)

Edward H. Bullard, Judge

Superior Court County of Santa Barbara

_____

Wayne C. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant Alexis Guzman.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Dennis Garcia Guzman.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Linda C. Johnson, Supervising Deputy Attorneys General, J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.