Filed 5/16/23  P. v. Castro CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO ALEJANDRO CASTRO,<br><br>    Defendant and Appellant. | D079230<br><br><br><br>(Super. Ct. No. RIF1403674) |

APPEAL from a judgment of the Superior Court of Riverside County, Samuel Diaz, Jr., Judge.  Affirmed.

Robert Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.


Francisco Alejandro Castro forcibly raped his biological daughter for the first time when she was seven years old.  Over the next five years, he

raped her countless times, committed other forcible sex acts upon her, and tortured her. When Castro's daughter began speaking out, he coerced her to cut her wrists, then returned her to her mother in Mexico, falsely claiming she had attempted suicide and that the injuries he caused were self-inflicted.

Castro's initial trial resulted in the jury convicting him of torture (Count 10; Pen. Code,[1] § 206), but unable to reach a verdict on the rest of the charged crimes, resulting in a mistrial on those charges. After a second trial, the jury convicted him of the remaining charged crimes, including perpetrating a forcible lewd act on a child (Count 1; § 288, subd. (b)); aggravated sexual assault of a child by rape (Counts 2, 4, 5, 7; § 269, subd. (a)(1); § 261, subd. (a)(2) & (6)); aggravated sexual assault of a child by sexual penetration (Count 3; § 269, subd. (a)(5); § 289, subd. (a)); aggravated sexual assault of a child by oral copulation (Counts 6, 8, 9; § 269, subd. (a)(4); § 288a); and sexual intercourse or sodomy with a child under 10 (Counts 11, 12; § 288.7, subd. (a)).

On appeal from the judgment of conviction, Castro raises three claims of error. First, he contends the trial court erred by admitting into evidence journal entries he made six years before the charged offenses occurred, which detailed his pursuit of his 16-year-old cousin when he was 24. Second, Castro asserts the prosecutor committed prejudicial misconduct by telling the jury that Castro's daughter could not, as a matter of law, consent to the sex acts committed against her. Finally, Castro argues the court erred by failing to instruct on lesser included offenses, despite his tactical decision at trial to waive those instructions in order to leave the jury with an all or nothing

---

[1]     All subsequent undesignated statutory references are to the Penal Code.

choice on the charged offenses. We reject Castro's arguments and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The Prosecution's Case*

Castro's daughter, hereinafter Jane Doe, was born in Mexicali, Mexico in late 1997. Doe met Castro for the first time around age five, when she lived with her mother in Mexico and Castro lived in the United States. When Doe was seven years old, her parents decided she should live with Castro. Castro smuggled Doe across the border in the trunk of his car and Doe stayed with him for several days. Doe became homesick, however, and went back to live with her mother.

Later the same year, Doe returned to the United States to live with Castro. She remained with Castro until she was 14 years old and the events giving rise to the present case came to light. During her time with Castro, Doe moved around a lot and attended many schools. She lived with Castro and, for some of the time, with his girlfriend Blanca, who had a son with Castro in 2009. Doe returned to Mexico in January 2012.

During her years in the United States, Doe was subjected to repeated acts of sexual abuse and physical violence by Castro. The abuse began shortly after Doe began living with Castro when she was in the third grade and between seven and eight years old. At that time they lived at the Palm Vista Apartments. The first incident of sexual abuse occurred in the living room, when they were play fighting on the sofa. Doe recalled sitting on Castro's belly when he touched her chest and vagina. She pushed him away and ran to her room. Castro followed her and taunted her, calling her a chicken and a scaredy cat. Castro also told Doe that if she told anyone he

3

would put her family in jail, or they would get in trouble, and he would tell everyone she started it.

Doe also recalled in vivid detail that Castro raped her on the hallway floor of the Palm Vista apartment. She testified that he held her hands down and penetrated her vagina with his penis. Doe told Castro it hurt and tried to fight him off. Castro ejaculated during this encounter and told her she could not get pregnant because she had not yet gotten her period.

While they lived at the Palm Vista apartment, Castro had sex with Doe in the hallway so often she could not remember the number of times it occurred. During this timeframe, Castro began having Doe perform oral sex on him and orally copulating Doe. Castro also told Doe she was not experienced at kissing, so he began kissing her on the mouth, using his tongue, as if they were a couple. Doe testified that during this time frame, on multiple occasions she woke up from sleeping with Castro's penis in her vagina.

Doe also testified that in this time period, Castro told her that she was the one who started the sexual acts. Doe would argue that she did not, but Castro told her this so frequently that she began to believe it was true. Doe testified that when Castro would get upset with her or ignore her or take something away, she would engage in sex acts with Castro to make him happy. In addition, Castro would punish Doe physically and sexually, and Doe would offer sexual acts as a way to avoid punishment.

In addition to the sexual abuse, Castro also physically abused Doe when they lived in the Palm Vista apartment. Once, he kicked her in the chest while she was sitting on the floor, causing her to fall against a sharp cabinet and cut her back. Another time he punched her so hard in the

4

stomach it knocked the air out of her. He also used his knuckles to hit her hard on the top of her head.

The abuse at the Palm Visa Apartments occurred between 2006 and 2007, when Doe was between eight and nine years old. During this period, Castro had sex with Doe approximately three times per month, and she remembered performing oral sex on him on at least twice.

When Doe was in fourth or fifth grade, she, Castro, and Blanca moved into Castro's sister Nellie's condo, and Doe transferred to a different school. The family spent time with Blanca's niece, who is a year or two older than Doe. Once, Castro, Doe, and Blanca's niece were play fighting. Doe testified that Castro went into Doe's room with Blanca's niece and closed the door, and then came out and wiped his mouth, insinuating to Doe he had been kissing the other child to make Doe jealous by saying the other child was better than her. At the time, Doe felt like she was in a relationship with Castro, which she thought was normal because Castro told her it was.

Also while living in Nellie's condo, Castro introduced Doe to alcohol. She would drink with Castro and by her herself, sometimes to the point of passing out. While living in Nellie's condo, Castro continued to engage in sexual activity with Doe at least once a month. Doe testified that during this time, she tried to enjoy the sex acts because it made her father happy, but she was embarrassed. He wanted her to moan but she could not do it and she would cover her face because she did not like him looking at her.

There were times when Castro had sex with Doe outside of the house. Once, they went on a camping trip with others on the Baja peninsula in Mexico. At night, Castro took Doe off-roading in his Jeep and parked in the middle of the desert to have sex with her. She was scared because others were driving nearby. On another occasion, Castro had sex with Doe in a

hotel room when they were traveling for a soccer tournament. On the day she got her green card, when she was nine years old, Castro had sex with her in a hotel room in Juarez, Mexico.

After living in Nellie's condo, Castro, Blanca, and Doe moved into a house in Moreno Valley, where Doe's brother was born. After that, the family moved into a house in Corona with Blanca's parents. In this house, Doe and Castro shared a queen-sized bed in one bedroom, while Blanca and Edward slept in another room. Doe testified that the bedroom door was locked most of the time. This sleeping arrangement had become normal and no one spoke about it. During this time, the frequency of the sexual abuse increased. Doe estimated it occurred five times per month. Castro continued to give Doe alcohol during this time.

At one point during this time period, Doe thought she might be pregnant. Castro did not use any form of birth control and told Doe he wanted to have a family with her. Castro brought Doe a pregnancy test, which she used and got a negative result. Blanca testified that she found the test and asked Castro about it; he told her he had gotten the test for Doe because she said she had sex with two boys at a party.

On another occasion while they lived in Corona, Castro was mad at Doe and so she cut her wrist with a steak knife because she thought it would please Castro to see she was hurting herself for him. Another time in Corona, Castro and Doe were in the bathroom when he hit Doe, causing her to fall to the floor, and then he shoved her head against the toilet. Blanca tried to come in to get Doe out of the bathroom, but Castro locked her out. Around this time, Doe showed Blanca a small bruise on her cheek and said Castro had punched her. Blanca testified that Castro admitted this abuse to her.

6

On Doe's thirteenth birthday, she was sleeping on the floor in the room next to the bedroom she normally shared with Castro and awoke to find Castro next to her, hitting her all over. Doe began crying, hoping that Blanca would find her and give her the chance to tell her about the ongoing abuse. Castro then called Doe to come into their bedroom, she got into the bed with him, and Castro apologized. Blanca then came into the room, and Castro told Blanca he had been hitting Doe. This led to an argument between Castro and Blanca, and they ended their relationship as a result. Blanca took Doe to Castro's sister Claudia's house, and Castro eventually moved into Claudia's house with Doe.

Doe was heartbroken by the absence of Blanca from her life. Doe loved Blanca like a mother, but was also angry because Blanca knew Castro physically abused Doe, but did nothing to stop it.

When Doe started seventh grade at a new school, Castro drove her to and from school and made her tell him every detail about her days. She transferred to another school during her seventh grade year. During this time, Castro continued to sexually abuse Doe. In Claudia's house, Doe and Castro lived there with Claudia and Castro's mother. As in the prior home, Doe and Castro shared a room and a bed. The sexual acts continued and increased in frequency to at least once a week or more. Sometimes alcohol was involved.

One time in this period, when Doe was 13 years old, she and Castro were having sex in the bathroom when Castro's mother tried to open the door. They said something to her, she walked away, and they continued having sex. Doe testified that in this period, Castro would initiate sex with Doe while she was sleeping and she would pretend to remain sleeping and cover her face with her hair so Castro could not see her. Around this time,

7

Castro would have Doe "dance for him like a stripper." Castro also showed her videos he had taken of himself having sex with her when she was drunk or passed out. Castro also had Doe pose for pictures naked and took pictures of her vagina.

Castro was also controlling in other ways in this time period. At one point, he insisted Doe carry a microphone to school so he could listen to her conversations while he was parked outside. He also read her text messages. Doe had few friends and her life revolved around school, soccer, and Castro. Around this time, Doe began to take steps to protect herself from Castro. She told Claudia about the sexual abuse, who responded that Doe was making up the allegations because she was mad at Castro. The family did bring in a priest to talk to Doe, but no protective measures were taken.

Then, one day after school, Castro saw Doe hug a boy. When Doe did not tell Castro about the hug, he became angry and told Doe he wanted to teach her a lesson. He gave her a choice; he would slap her or burn her. She chose the slap. Castro slapped her hard in the face, causing her to fall to the ground. Then, Castro told Doe that was not enough, and he grabbed a knife and a lighter and took her downstairs.

Doe was crying and scared. Castro laid her face down, tied her hands and legs with zip ties, and put a towel in her mouth. He then held the lighter to the knife until the knife turned black-hot. Doe lay on the ground, begging Castro not to burn her. He then sat on her lower back, put the hot knife to her bare skin, and slowly counted to five. Castro then cut off the zip ties and told Doe to go upstairs and act normal. He cleaned the burns on her butt

with alcohol and gauze that would stick to the burned skin, which was peeling off. The burn left a scar.[2]

Doe told Castro's mother about the burn. The family, Castro's mother and two sisters, gathered to talk to Castro and told him that they had contacted child protective services and a social worker was coming to the house. The day after Castro's family called child protective services, January 17, 2012, Castro took Doe to her mother's home in Mexico. Before they left, Castro and Doe planned for Doe to tell her mother that she was harming herself, including the burn.

Doe testified that before leaving for Mexico, at Castro's instruction she also cut herself using razor blades along her left arm. Castro took pictures of the cuts, and Doe thought he seemed impressed.[3] Castro also told Doe he would erase the pictures and videos he had taken, and they went to the desert and burned her diaries. Castro told her this was a fresh start and they were leaving the past behind.

Castro drove Doe back to Mexico. Once there, Castro told Doe's mother she was depressed and misbehaving, and Doe went along with his story. Castro said Doe had tried to kill herself and they showed Doe's mother the cuts.

A couple of months later, Castro came back to get Doe. Doe, however, refused to go. Her mother came home and got mad that Castro was trying to take Doe against her will. Castro, irate, threatened he had documents to

---

[2] This incident was the basis for the torture conviction (count 10) obtained by the prosecution at the first trial.

[3] A forensic investigation of a hard drive found in Castro's room contained the photos, one photo of the cuts just after they occurred and several taken a few days later.

9

hurt the family, then left.  Doe's mother worried that she was suicidal, but Doe told her it was all a lie.  Doe told her mother that Castro had burned her and cut her, and physically abused her.  She reported the abuse to her mother gradually.  She showed her mother the burn and told her how Castro had caused it.  She also said the cuts on her arms were part of a punishment by Castro, and that he would hit her if she did not play well in sports.  Doe's mother confronted Castro about the physical abuse over the phone, and he apologized.

Thereafter, Doe continued to talk to her father via phone, email, and Facebook messages.  Doe realized Castro had made her believe the sex was her fault, and she began to realize the scope of his abuse.  She threatened to throw him in jail, to tell her mother, and claimed she had evidence of what he had done.  Castro, however, had her green card and would not give it back.  One night, after she had been back in Mexico for two months, Doe went into her mother's room while her mother was sleeping, woke her mother, and told her for the first time about some of the sexual abuse perpetrated by Castro.  Her mother cried and felt guilty that she had not known.

During this time, Doe continued to communicate with Castro online, at times confronting him about the abuse she suffered.  In a Facebook message to Castro, she wrote: "Hi dad.  I know we haven't talked for months and it's cause I didn't want to and you know why.  I'm only sending this message to tell you that I want to see my brother Edward.  You told me you can take him to Mexicali and I would like you to call my mom to tell her.  Then you can leave him with my aunt Erika or someone and then I can see him.  But just to be clear that I don't want to see you again ever.  I regret everything I ever did.  I don't want to tell you more.  I miss my brother and I want to see him. I know you can at least do that for me."  Doe testified that when she said she

10

regretted everything, she meant the sexual acts and the lies she told to cover for Castro.

Castro replied to the Facebook message, "I love you so much and miss you even if you hate me and never want to see me. I'll never stop loving you. I hope that one day you forgive me and give me another chance to start over. But this time it will be like never, maybe you'll never do it, but I will not rest in the attempt. I love [Jane Doe] and will never forget you. Never." Castro continued to message Doe, begging her to communicate and have a relationship with him. Doe got upset and started threatening to throw Castro in jail and tell on him. She engaged in written conversation with Castro, at times expressing anger and other times stating she missed him.

In his messages, Castro admitted Doe had every reason to hate him, and told her he was embarrassed about everything he had done. He told Doe, "you need to always remember that I love you. I am so sorry that you had a dad like me." Castro also told Doe, "you should be happy that you are being protected from the monster that I was." He assured her that nothing bad would happen to her brother after her mother talked to his family "about the things I did to you." He said his family had become watchful and things had changed, and Blanca would protect Edward. He also wrote that he had been suffering from guilt, that he broke Doe down and destroyed part of her soul, that he was sorry, and that he would never heal. He told Doe, "I really hope that the damage I have caused you can be healed so that you won't be tormented by it."

Doe created a new Facebook account specifically to ask Castro questions that she intended to turn over to the police. Her message from this account to Castro asked seven questions. She wanted to know why Castro first took her across the border without waiting for her passport; why he

11

started touching her when she was little, and told her she started it; why he hit her so much; why he started touching her and having sexual interactions with her when she was little; why he raped her and told her things were different; how was it possible he was in love with her if he was her dad; and why he had burned her.

Castro responded to the seven questions. He said her mother was going through personal problems and could not take care of Doe and they thought Doe would be better off with Castro. In response to the second question, he wrote, "you didn't do anything wrong. I initiated everything and I told you all of those things to make you feel guilty and so that you would always feel that it was your fault." In response to her question why did Castro hit her, he wrote that he had a violent life and history repeats itself. He did not know how to handle it when she misbehaved. He could not hit her mother so he placed his anger on Doe. With respect to the sexual abuse, Castro wrote that he and his sister were abused and that he kept having sex with her because he was already feeling guilty. Castro also wrote that he thought it was possible to be in love with Doe, stating, "[y]ou were an obsession for me. At times I thought you were your mom and I know that is not normal. It is my sick mind." Finally, Castro wrote that he would never forgive himself, that he hit her, that he was a monster with her, what he did to her was "indescribable," and that it was as if he was controlled by the devil.

Thereafter, Doe's mother again confronted Castro. Her mother testified that Castro responded by threatening to harm her and Doe. After that, Castro stopped having contact with them, though he did send money for child support. Doe's mother then reported Castro's conduct first to Mexican authorities, then to the police in Calexico, California.

After Doe's mother reported the abuse, police conducted a search of Castro's home. During the search, officers found a laptop, a hard drive, and several journals. The laptop contained a thumb cache file that had been deleted, which included six photos of a naked female. The hard drive contained photos of arm injuries, one showed an arm with cuts that were actively bleeding and others showed an arm with healing cuts. The first arm picture was taken on January 16, 2012 in Riverside. The others were taken on January 22, 2012 in Mexicali. The journals contained entries from when Castro was 24 years old about his pursuit of a sexual relationship with his 16-year-old cousin.

The prosecution also offered the testimony of Jody Ward, a clinical psychologist, about Child Sexual Abuse Accommodation Syndrome (CSAAS). She told the jury there are five components to CSAAS: secrecy, helplessness, entrapment and accommodation, delayed unconvincing disclosure, and retraction or recantation. Ward stated that abused children keep the abuse secret to keep their family together; they depend and rely on the abuser and need them in their lives. Further, children believe they are to blame for the bad things that happen around them. Ward stated it is common for children to initiate the sexual acts as part of accommodation. Finally, she opined that child victims can be loyal and loving towards a person who is abusing them as a way of compartmentalizing or accommodating.

2. *Defense Case*

Castro's mother testified on his behalf. She told the jury she frequently visited Doe, Castro, and Blanca and never saw anything suspicious or inappropriate. She testified that she was very close with Doe when she was a child, and Doe never complained to her about Castro. Doe did show Castro's mother a burn on her left buttock, and Doe told her Castro had caused it. At

13

the time, Castro's mother confronted him and said they were going to have a talk with Castro's sister Claudia when she got back into town a few days later. During this conversation, Claudia told Castro she was a counselor and would report the incident. Castro admitted to his mother that he hit and burned Doe.

Blanca's niece testified that she would have sleepovers with Doe because they are close in age. She did not notice any sexual touching or physical violence, and Castro did not make any sexual advances towards her. She testified that she did not recall the situation Doe described where she and Castro were in a room and then Castro insinuated that he had been kissing her.

Castro's sister Claudia testified that she visited Castro and Doe often, but never saw Castro physically discipline Doe or do anything sexual towards her. Doe and Claudia spent time together and talked, but Doe never complained to her about Castro. In 2012, Doe showed Claudia the burn and told her Castro had caused it. Claudia reported the matter to child protective services, and the family confronted Castro about the abuse.

In his closing argument to the jury, Castro's defense counsel argued that Castro could not be found guilty of Counts 2 through 9 because Doe's own testimony showed that she voluntarily engaged in the sex acts at issue. Castro's counsel also argued Doe was lying and focused on the evidentiary standard, asserting the prosecution had failed to meet its burden to show that Castro was guilty of the charged offenses beyond a reasonable doubt.

3. *Verdict & Sentencing*

After the conclusion of trial, the jury convicted Castro on all charges: one count of forcible lewd act on a child (Count 1; § 288, subd. (b)); four counts of aggravated sexual assault of a child by rape (Counts 2, 4, 5, 7; § 269,

14

subd. (a)(1); § 261, subd. (a)(2) & (6)); one count of aggravated sexual assault of a child by sexual penetration (Count 3; § 269, subd. (a)(5); § 289, subd. (a)); three counts of aggravated sexual assault of a child by oral copulation (Counts 6, 8, 9; § 269, subd. (a)(4); § 288a); and two counts of sexual intercourse or sodomy with a child under 10 years old (Counts 11, 12; § 288.7, subd. (a)).

Thereafter, the court sentenced Castro to a determinate term of five years plus 177 years to life. Castro timely appealed from the judgment of conviction.

## DISCUSSION

### I

Castro first asserts that the conviction must be reversed because the trial court erred by admitting into evidence entries from his journals showing his seduction of his 16-year-old cousin when he was 24 years old, approximately six years before the crimes in this case began to occur. The Attorney General responds that the trial court did not err since the journal entries were probative of Castro's intent. Alternatively, the People contend that even if the entries were improperly admitted, the error was harmless.

### A

### *Additional Background*

Prior to trial, the prosecutor brought a motion under Evidence Code section 1108 to admit portions of Castro's journals that discussed his relationship with his 16-year old cousin when he was 24 years old. The defense objected on multiple grounds, including that the conduct described in the journal did not fall within an enumerated sex crime under Evidence Code section 1108, and that its admission violated the corpus delicti rule because there was no evidence corroborating the events described by Castro in his

15

journal.  At a hearing on the motion, the prosecutor responded that the corpus delicti rule did not apply to uncharged crimes.  Defense counsel stated there was a conflict in authority and he wished to preserve the issue.

The court ruled the evidence was inadmissible under Evidence Code section 1108 because it was too remote and prejudicial.  But it found the journal entries were admissible under Evidence Code section 1101, subdivision (b) on the issue of intent, and that the evidence was not precluded under Evidence Code section 352.

At trial, the prosecutor introduced several excerpts of Castro's journal entries, which were read to the jury by one of the detectives who investigated the case.  In the first entry, dated January 23, 2000, Castro wrote, "I know I have done wrong by kissing you, dear cousin, but I like you truly.  I miss you, and I would like someday to take you to my bed.  Eventually you shall be mine.  And with that lust, passions and the ... loot of your wits.  Today we spoke, my mother and I, about buying a house.  We had a few arguments, but nothing serious.  What's my reputation?  What are my passions?  I must work on my wits, I must.  Good night."

In an entry dated August 13, 2000, also read into evidence by the detective, Castro wrote: "Mexicali at my aunt Gabby's house.  It's 6:14.  Ivonne, Ivonne, oh, yes indeed.  Oh, sweet, sweet night."  The entry continued,

> "I had a sweet dream this morning.  I was wakened by my mistress.  I felt a strange ... And I opened my eyes ... I got scared, and there she was, Ivonne, trembling on her knees. She said she was cold, so I removed my blanket, and I put it around her.  After a minute, I embraced her, no kisses, just an embrace.  I removed myself from her, and I saw her face.  She said she had to go.  She went somewhere on the other side where the blanket divides the house.  She came back and sat on the sofa where I was lying.  I put the blanket on her again, and I embraced her strongly like a

16

true father would like the father that she sadly does not have.  In that moment, I thought that she wanted me to kiss her or was just testing me, but I continued with my ... embraces.  I felt that she was tranquil and happy, not a worry."

"That I would try something out of my manners, in fact, everything was so perfect that she removed the blanket in a way that her chest was without protection.  And it was there that I realized that indeed that special moment was a summer night's dream.  I introduced my hand on her back caressing it, and then I reached her bosoms.  Then we laid on the bed with devils playing with our minds.  The sun was coming out and she said to me that she had to go, but she did not do it like she used to.  This time she just said it.  I immediately stop and got her up and I did the bottoms of her pajamas.  I was kissing her while doing it.  We played for a while, and then she left.  I went to her room, and while walking towards the room, I saw that my aunt's door of her room was open.  Therefore, I went back to the living room, and I got the pillow and we entered Ivonne's room.  The door was open, and I entered slowly.  I was amazed to see that she was laying on her bed flat like a princess in ... and she did not have on the bottoms, only one which holds her bosoms.  She said I was nuts, and for me to retire from her room.  And so I woke from my dream.  Is it only a desire, is it love, is it blinded love.  I don't know what to do after."

The prosecutor introduced seven additional journal excerpts through the detective.  The entries, spanning July and August 2000, were similar in nature, consisting of flowery language expressing Castro's sexual interest in and pursuits of his younger cousin.

While the detective was on the stand testifying about the content of the journals, the court gave limiting instructions to the jury.  The court read CALCRIM Nos. 303 and 375, which state:

"During the trial, certain evidence will or has been admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other.  The People will present evidence of other behavior by the defendant that is not charged in

17

this case regarding Ms. Ivonne [L]. You may consider this evidence only if the People have proved by preponderance of the evidence that the defendant, in fact, committed the acts. Proof by preponderance of evidence is a different burden of proof than beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide the defendant committed the acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

"The defendant acted with the same sexual intent towards children in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses.

"Do not consider this evidence for any other purpose except for the limited purpose of intent.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude the defendant committed the acts, that conclusion is only one factor to consider with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of these charges. The People must still prove each charge beyond a reasonable doubt."

Before its deliberations, the jury was instructed pursuant to CALCRIM No. 359 as follows: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may rely on the defendant's out-of-court statements to convict him only if you first conclude that other evidence

18

shows that the charged crime or a lesser included offense was committed. [¶] The other evidence may be slight and may only be enough to support a reasonable inference that a crime was committed. [¶] This requirement of other evidence does not apply to proving the identity of the person who committed the crime. If other evidence shows that the charged crime or a lesser included offense was committed, the identity of the person who committed it may be proved by the defendant's statements alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

The jury was also again instructed pursuant to CALCRIM No. 375. Finally, during her closing argument, the prosecutor argued the limiting instruction explicitly: "Now, one of the CALCRIMs that you're going to get in the back is CALCRIM 375. Now, that CALCRIM is in regards to uncharged acts to prove the defendant's intent. This has to do specifically with the journal entries. Now, the journal entries can only be used for this purpose. If I can– if I have proven to you by a preponderance of the evidence that the uncharged conduct in the journals occurred, then you can conclude from that that if you believe that that incident happened, and that the defendant harbored the same intent on those occasions, then you can use that intent to show he had a similar intent in this case. It can only be used for an intent. It can't be used for showing he has some proclivity towards children. It's specifically for the defendant's intent. You can use it as a factor of his intent, but it can't be the end all, be all." In his closing argument, Castro's counsel did not address the journal entries.

19

## B

### *Legal Standards*

Character evidence, also described as evidence of a propensity to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) This general rule against admitting propensity evidence to prove conduct, however, "does not prohibit admission of specific acts of misconduct to establish a material fact like intent, common design or plan, or identity ([Evid. Code,] § 1101, subd. (b)), and does not affect the admissibility of evidence regarding the credibility of a witness (*id.*, subd. (c))." (*Villatoro*, at p. 1159; see *People v. Denis* (1990) 224 Cal.App.3d 563, 567 (*Denis*) [propensity "evidence can nonetheless be admitted if it is logically, naturally, and by reasonable inference probative of motive, knowledge, identity, intent, opportunity, preparation, plan, or absence of mistake or accident"].)

Under Evidence Code section 1101, subdivision (b), the trial court has discretion to admit evidence of conduct committed by a defendant other than the conduct for which he is charged, if such evidence is relevant to prove some fact at issue, and if the probative value of the evidence is not substantially outweighed by the probability its admission will create a substantial danger of undue prejudice. (*People v. Hawkins* (1995) 10 Cal.4th 920, 951 (*Hawkins*), abrogated on other grounds as stated in *People v. Lasko* (2000) 23 Cal.4th 101; *People v. Daniels* (1991) 52 Cal.3d 815, 856 (*Daniels*).) Evidence of uncharged conduct may be admitted to prove any fact material to the prosecution's case. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 407 (*Ewoldt*).)

The admission of evidence under Evidence Code section 1101, subdivision (b), is addressed to the sound discretion of the trial court. (*People*

*v. Memro* (1995) 11 Cal.4th 786, 864.)  Accordingly, on appeal, a trial court's admission of such evidence is reviewed under the deferential abuse of discretion standard.  (*People v. Gray* (2005) 37 Cal.4th 168, 202; *Memro,* at p. 864.)  The trial court's ruling will not be disturbed on appeal absent a clear showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614.)

When a trial court misapplies Evidence Code section 1101, or Evidence Code section 352, the applicable standard of prejudice is that for state law error as set forth in *People v. Watson* (1956) 46 Cal.2d 818.  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 716, citing *People v. Malone* (1988) 47 Cal.3d 1, 22.)  Under *Watson*, a reversible "miscarriage of justice" can be declared only when the reviewing court, after an examination of the entire cause, is of the opinion that it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error.  (*Watson,* at p. 836.)

## C

### *Corpus Delicti Rule*

Castro first asserts the court erred by admitting the journal entries because there was no other evidence corroborating his statements in the journal lusting over and describing sexual contact with his minor cousin. Castro asserts there is a conflict among our state's Courts of Appeal as to whether the corpus delicti rule should be applied to evidence of prior conduct admitted under Evidence Code section 1101, subdivision (b).  The Attorney General responds there is no such conflict, and the corpus delicti rule does not apply to this evidence.

The corpus delicti rule has been explained " ' "this way:  every crime 'reveals three component parts, first the occurrence of the specific kind of injury or loss (as in homicide, a person deceased; in arson, a house burnt, in larceny, property missing); secondly, somebody's criminality (in contrast, e.g. to accident) as the source of the loss, —these two together involving the commission of a crime by somebody; and thirdly, the accused's identity as the doer of this crime.' …  [T]he first two without the third constitute the corpus delicti." ' " (*People v. Davis* (2008) 168 Cal.App.4th 617, 633, italics omitted.)

" 'In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.' …  The purpose of the corpus delicti rule is to satisfy the policy of the law that 'one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' " (*People v. Miranda* (2008) 161 Cal.App.4th 98, 107.)

Castro asks this court to extend the rule to his journal entries, which he characterizes as uncharged crimes. However, "[t]he corpus delicti rule has never been used to exclude evidence of prior crimes when offered not to prove that defendant committed them but rather solely for the limited purpose of showing defendant's state of mind at the time of the charged offense." (*Denis, supra,* 224 Cal.App.3d at p. 569.) We decline to be the first to do so.

In support of his argument that the rule should be extended to this evidence, Castro relies on a plurality opinion in *People v. Robertson* (1982) 33 Cal.3d 21 (*Robertson*), *People v. Williams* (1988) 44 Cal.3d 883 (*Williams*), and *People v. Hamilton* (1963) 60 Cal.2d 105 (*Hamilton*). These cases, however, do not support Castro's argument. "In *Robertson* the uncharged conduct was inadmissible because [it was] unduly prejudicial, so the court explicitly declined to pass judgment on the People's contention the corpus delicti rule is inapplicable when the evidence of the defendant's prior criminal acts is offered for the limited purpose of showing facts in issue, rather than for the purpose of proving the prior crime.[4] (*People v. Robertson, supra*, 33 Cal.3d 21, 41–42.) In *Williams* the corpus delicti rule was held satisfied by independent evidence of the uncharged crimes. (*People v. Williams, supra*, 44 Cal.3d 883, 910–911.)" (*Denis, supra,* 224 Cal.App.3d at p. 569.)

*Hamilton* "involved the penalty phase of capital cases, and stand[s] for the unassailable proposition that the prosecution, in proving a defendant's commission of other offenses as an aggravating circumstance warranting imposition of the capital penalty, must prove the corpus of those other

---

4    Without deciding the issue of whether the corpus delicti rule applied to the evidence, the plurality opinion commented that the testimony of the victim that the defendant told her he committed two other murders was "objectionable on the ground that no independent evidence of the corpus delicti of those crimes was ever introduced." (*Robertson, supra*, 33 Cal.3d at p. 41.)

offenses." (*Denis, supra*, 224 Cal.App.3d at p. 569.) None of these cases hold that the corpus delicti rule requires exclusion of evidence admitted under Evidence Code section 1101, subdivision (b); nor do the cases involve evidence analogous to that at issue here. *Robertson*, *Williams*, and *Hamilton* do not lead us to conclude the corpus delicti rule required exclusion of Castro's journal entries from evidence.

As the Attorney General points out, allowing Castro's journal entries into evidence for the purpose of corroborating that his state of mind was an intent to abuse his daughter, and not to prove he committed other crimes, does not offend the purpose of the corpus delicti rule. Rather, the rule exists to prevent a conviction for an offense that never occurred. No such risk is at play when a defendant's own statements about prior conduct are admitted into evidence to show a fact at issue, here Castro's intent to commit various crimes against Doe.

D

*Evidence Code section 352*

Castro next argues that even if properly admitted into evidence, the journal entries should have been excluded under Evidence Code section 352 as unduly prejudicial, since there was no question that if Castro committed the offenses, he intended to do so. The Attorney General responds the trial court did not abuse its wide discretion by admitting the evidence.

To be admissible under Evidence Code section 1101, subdivision (b), evidence must also meet the test of Evidence Code section 352. Specifically, the probative value of the evidence must not be substantially outweighed by the probability its admission will create a substantial danger of undue prejudice. (Evid. Code, § 352; *Hawkins, supra*, 10 Cal.4th at p. 951; *Daniels, supra*, 52 Cal.3d at p. 856.) The "prejudice" referred to in Evidence Code

24

section 352 is " 'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1197, citing *People v. Crittenden* (1994) 9 Cal.4th 83, 134.)  The trial court's decision under this provision is reviewed for abuse of discretion.  (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

"Painting a person faithfully is not, of itself, unfair." (*People v. Harris* (1998) 60 Cal.App.4th 727, 737.)  " ' "The prejudice which [Evidence Code section 352] is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.'  [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors." ' " (*Id.*, at p. 737.)

Under Evidence Code section 352, the probative value of uncharged acts evidence offered to prove intent "must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses." (*People v. Branch* (2001) 91 Cal.App.4th 274, 282, citing *Ewoldt, supra*, 7 Cal.4th at p. 404.)

We agree with the Attorney General that the journal entries were probative of Castro's intent to abuse his daughter and the improbability of Castro's defense that Doe consented to the sexual contact.  The statements he wrote about his cousin were relevant to show his predatory intent towards his daughter, and his lack of a reasonable belief that Doe consented to his sexual abuse of her.  The writings, which contained flowery overtures of his love and desire of his cousin, showed Castro was capable of maintaining both

25

paternal feelings for a younger close relative and simultaneously capable of the type of conduct that led to his arrest in this case.

On the other side of the equation, the factors considered by the trial court do not show an abuse of discretion. The conduct described in Castro's journal was less inflammatory than the facts at issue in the case, the object of his affection was his 16-year-old cousin not his young daughter, and Castro himself was younger at the time of the journal entries. The cousin was not reliant on Castro and did not live with him. This factor, the egregiousness of the uncharged offenses, supported the court's decision to allow the evidence. In addition, there was little possibility of confusion between the conduct described in the journals and that at issue in the trial; the journal entries were not particularly remote in time, taking place just six years before Castro's abuse of Doe began; and presentation of the evidence was brief and completely unrebutted by Castro. Each of these factors supported the court's decision to allow the evidence, which we conclude did not constitute an abuse of discretion.[5]

_____

[5]    Castro relies on *People v. Balcom* (1994) 7 Cal.4th 414 to support his undue prejudice argument. In *Balcom*, the defendant was charged with placing a gun to a stranger's head to force her to engage in sexual intercourse. The defendant testified that the victim consented. The Supreme Court determined that the introduction of evidence about a prior rape also at gunpoint was improperly admitted to prove intent (though properly admitted to show common design or plan) because it was cumulative and unduly prejudicial. (*Id*. at pp. 418, 426–427.) In so holding, the court explained that on the facts of the case the defendant's intent could not be reasonably disputed because the primary issue was whether or not the defendant forced the victim to engage in sexual intercourse by holding her at gunpoint. If he did, the nonconsensual nature of the act was clear, and the prior act was cumulative as to the issue of his intent. (*Id*. at p. 423.)

E

*Harmless Error*

Finally, even if the admission of the journal entries into evidence was error, we would conclude the error was harmless. The evidence of Castro's guilt was substantial and largely undisputed. Doe's testimony was that Castro forcibly raped her when she was seven years old, then groomed her and continued to abuse her for more than five years. Doe also testified that Castro gave her alcohol and photographed her in sexually explicit poses while she was drunk or unconscious. Further, files from Castro's computer contained sexually explicit photographs of Doe, and Castro admitted having sex with her, admitted telling her it was her fault, and admitted that he was a monster in his Facebook messages to her.

In addition, the potential for undue prejudice was limited by the trial court's instructions to the jury. (*People v. Kipp* (1998) 18 Cal.4th 349, 372; *People v. Barnett* (1998) 17 Cal.4th 1044, 1118.) The jury was instructed with CALCRIM Nos. 303 and 375 about the limited use of the journal evidence. The jury was also instructed on the corpus delicti rule. Finally, the prosecutor did not emphasize the journal evidence, except to remind the jury of its limited purpose.

On this record, we cannot say that the introduction of the journal entries into evidence prejudicially tipped the scales in any meaningful way.

---

Here, unlike *Balcom*, there was no specific fact that if true, eliminated the issue of consent. While holding a stranger at gunpoint unquestionably eliminates consent, here, Doe's testimony provided the basis for Castro's consent defense. Castro's writings about his cousin, including statements showing he thought his conduct was wrong and his successful attempt to overcome her will, were probative of his predatory intent and not cumulative to any other specific piece of evidence negating the defense.

27

We conclude there was no reasonable probability that Castro would have obtained a more favorable result absent this evidence.[6]

## II

Castro next argues that the trial court committed reversible error by allowing the prosecutor to state during her closing argument that when Doe was eight, nine, and ten years old, Doe could not legally consent to the sex acts that formed the basis for the crimes. The argument was made to counter Castro's defense that he could not be found guilty for many of the crimes because Doe had voluntarily engaged in the sex acts. The Attorney General responds there was no error because the prosecutor abandoned the argument and Castro's trial counsel was permitted to fully present Castro's consent defense.

## A

### *Additional Background*

During cross-examination of Doe, Castro's attorney asked her if she consented to have sex with Castro. The prosecutor's objection to the question was sustained and the parties went to a sidebar. The trial court then overruled the objection and said it would give the defense limited leeway to explore the issue of consent pending resolution of the legal issue.

Doe testified that as to the first incidents at the Palm Vista apartment, she did not remember if she consented, but said it was possible. She then

---

[6]    Castro argues that this asserted error was prejudicial as a "matter of fact" because the journal entry evidence was not admitted in the first trial, and the jury was unable to reach a verdict on any of the sexual abuse charges. This is an oversimplification of the issue and Castro provides no legal or factual support for this contention; it is not this court's role to engage in such conjecture. We do note one critical difference illuminated in the record, which is that in the first trial Castro did not pursue the consent defense, rather his counsel argued only that Doe was dishonest and made up the allegations to get back at her father for physically abusing her.

stated that during the first act of intercourse, she told Castro it hurt, but did not know if she said stop. She also testified Castro was holding her hands down, she was in pain, and she was trying to fight him. As discussed, Doe also testified that when they lived at the Corona house, she would agree to or suggest sex with Castro, and she volunteered sex acts at other times as well.

The jury was instructed on the crime of rape by force, fear, or threats, sexual penetration by force, fear, or threats, and oral copulation by force, fear, or threats. (CALCRIM Nos. 1000, 1045, and 1015.) Each instruction specifically required the People to prove that "[t]he other person did not consent" to the act and explained that "[i]n order to consent, a person must act freely and voluntarily and know the nature of the act." The instructions also stated the defendant was not guilty if he actually and reasonably believed the other person consented, and that the People had the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe the other person consented.

During her closing argument, the prosecutor stated: "The third element is that the victim did not consent. So let's talk about that. She's eight years old, nine, ten. She legally can't consent." Castro's counsel objected and requested a sidebar. The court expressed frustration that Castro's attorney had not briefed the issue and explained the court had conducted its own research and had not discovered any law that would allow Castro to assert he was not guilty because Doe consented to the conduct that formed the basis for the charges. The court then stated that it was prepared to remove language from the jury instructions indicating that consent was a defense.

The prosecutor then expressed concern about modifying the jury instructions. Castro's attorney emphasized the risk, stating "If we leave [the

29

consent language] in and he's convicted there's no issue, if we take it out and he gets convicted this is an issue." After a brief recess for the prosecutor to consult with her office, the parties agreed to leave the defense of consent in the instructions. The court then stated, "We'll leave it in then; we'll let the jury decide," and told Castro's counsel, "And you could argue consent, you could argue whatever you want."

Thereafter, the prosecutor did not argue that a minor could not consent as a matter of law. Rather, she argued that even if Doe did not refuse Castro's sexual advances or even initiated sex acts with him, her conduct did not constitute consent because of her age and because it was the result of Castro's manipulation and abuse.

B

*Analysis*

As the Attorney General argues, after Castro's counsel objected and the matter was discussed outside the presence of the jury, the prosecutor abandoned the argument that Doe could not consent as a matter of law because she was a minor. After the prosecutor's initial statement, she did not repeat her assertion that Doe could not give legal consent, instead arguing that any consent by Doe, even if she was initiating the contact, was a result of the force, fear, duress, and manipulation asserted over her by her father. In sum, the prosecutor argued that Doe did not freely and knowingly understand what Castro was doing to her.

Castro's counsel then argued in his closing statement that Doe had consented to many of the crimes at issue, and thus the prosecution had failed to carry it's burden to show Castro was guilty of those crimes. The jury was given instructions that required it to consider whether Doe consented to the acts. As noted, the consent element was not removed from the instructions as

30

the trial court initially suggested. As a result, the jury considered the consent defense advanced by Castro at trial and flatly rejected that characterization of the evidence. Given the prosecutor's abandonment of her brief, initial assertion that legal consent was not possible and Castro's failure to request any admonishment, Castro's argument fails.[7] (See *People v. Caro* (2019) 7 Cal.5th 463, 512 ["the alleged misconduct was, in any event, so minimal as to have no reasonable probability of affecting the outcome."] and *People v. Osband* (1996) 13 Cal.4th 622, 717 ["When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' "].)

Castro asserts that the prosecution did continue to argue that Doe could not legally consent. This is a mischaracterization of the prosecutor's argument. In her rebuttal closing statement, she did assert that Doe did not "agree to having sex with her father in the legal way, the way that a person needs to understand and have that capacity to weigh the costs and benefits, the consequences of taking on this kind of adult situation." However, we do not view this statement as an assertion that Doe could not consent *as a matter of law*. Rather, it was an appropriate argument that even if a child does not object to sexual contact, she does not have the emotional ability to

---

[7]     In his reply brief, Castro asserts that requesting an admonition after his objection was sustained was futile because "the trial court had ruled that the prosecutor's argument was not a misstatement of the law." However, the trial court accepted the parties agreement that consent was not lacking as a matter of law and the parties made their respective arguments with that understanding. In the end, the trial court agreed with the defense position, negating Castro's contention that a request for an admonition would have been futile.

make such a decision, i.e. consent to the conduct. The prosecutor was responding to the assertion of Castro's counsel that a child of that age *could* knowingly agree to such contact—the prosecutor's statements did not constitute error.

## III

Finally, Castro contends his convictions must be reversed because the trial court failed to instruct on the lesser included offenses for Counts 2 through 9. The Attorney General responds that the court did not err because this is the rare case in which the trial court's duty to instruct was obviated by the defendant's tactical decision to risk a conviction on the greater charges to avoid facing the lessor ones as an alternative.

## A

### *Additional Background*

Each of the crimes charged in Counts 2 through 9 have non-forcible lesser included offenses that do not require the acts to be against the victim's will. In Castro's first trial, where he did not pursue the consent defense, the court instructed the jury on the lesser included offenses. At the second trial, however, Castro expressly requested the court not to instruct the jury on the lesser included offenses. During a conference on the instructions, Castro's counsel stated, "The only lesser we're requesting right now is for Count 1, the [Penal Code section] 288, subdivision (a)." The court said, "And that is a lesser included. The Court will give the lesser included offense." Castro's counsel then added, "And for the record, I've spoken with Mr. Castro about the lesser related offenses, and we both agree *for tactical reasons* not to include them." (Italics added.)

B

*Analysis*

As a general rule, courts must instruct on lesser included offenses that are supported by the evidence, even over a defendant's objection. " " "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] ...' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." ' [Citation.]" (*People v. Medellin* (2020) 45 Cal.App.5th 519, 525 (*Medellin*), citing *People v. Souza* (2012) 54 Cal.4th 90, 114.)

Despite this policy, " 'the claim may be waived under the doctrine of invited error if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction.' " (*Medellin, supra*, 45 Cal.App.5th at p. 525.) The invited error doctrine applies here.

In *Medellin*, the court applied the doctrine where the defense attorney told the court the defense was not asking for lesser included offenses and responded, "Yes, your honor" to the trial court's question as to whether there were legitimate strategic purposes for making the request. (*Medellin, supra*, 45 Cal.App.5th at p. 524.) Here, Castro's counsel did not have to be asked. Rather, he volunteered "for the record" that he had spoken to Castro about

33

the decision and offered that "we both agree for tactical reasons not to include them."

Castro's reasons were logical in light of his reliance on the defense that Doe consented—the difference between the crimes is the element of consent. Thus, the lesser-included offense instructions would have exposed Castro to substantial criminal liability even if the jury accepted his defense. Given the weight he placed on Doe's claims that the sexual activity was voluntary, Castro reasonably decided the evidence of consent was strong enough to create reasonable doubt and the possibility of a complete acquittal.

"Allowing the defense to cause the error, lose at trial, and automatically obtain reversal on appeal would reward the defense's failed gambit and eliminate the rule's purpose." (*Medellin, supra*, 45 Cal.App.5th at p. 526.) This case presents the textbook example of invited error in the context of lesser included offense instructions. Accordingly, the trial court's failure to give the instructions did not constitute error.

DISPOSITION

The judgment of conviction is affirmed.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.

34